2017 IL App (1st) 142879

No. 1-14-2879

Opinion filed June 27, 2017

Second Division

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) ) | |
| v. | ) ) | No. 10 MC6 014663 |
| JAMES JACKSON, | ) ) ) | The Honorable Thomas J. O'Hara, |
| Defendant-Appellant. | ) ) ) | Judge, presiding. |

PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.
Justice Neville concurred in the judgment and opinion.
Justice Mason dissented, with opinion.

**OPINION**

¶ 1    After James Jackson calls 911 for an ambulance, the paramedics arrive to find him "agitated," "nervous," "irrational," and "very uncooperative," suffering from some type of psychological issue and with an "altered" mental state. The paramedics call for police assistance. Jackson screams and flails; one officer uses his Taser on Jackson, striking him 10 times. Another officer tries to grab Jackson and gets kicked in the shins. Jackson resists being placed in handcuffs. Ultimately, the police subdue him and place him into the ambulance for transport to the hospital. Jackson is charged and convicted of battery and resisting arrest.

¶ 2    This, in sum, is what happened to James Jackson, and what happens all too often to individuals who may be experiencing a mental health or other crisis. When they (or their families) call for help, they are met with some use of force by officers. See U.S. Dep't of Justice Civil Rights Div. & U.S. Attorney's Office Northern Dist. of Ill., *Investigation of the Chicago Police Department* 37 (2017), https://www.justice.gov/opa/file/925846/download (listing incidents where Chicago police officers "used force against people in crisis who needed help"). The DOJ report reveals that, as here, law enforcement officers, often "first responders" to mental health emergencies, are not necessarily trained or prepared to deal with the complex situations in which they may find themselves. The lesson in these cases can be stark: call 911 and someone could end up charged with a crime, or worse. (The dissent states that there is no evidence that Jackson was mentally ill, *infra* ¶ 101, but this ignores testimony from *every* state witness that Jackson was "irrational." The ultimate diagnosis is irrelevant—what matters is how Jackson acted.)

¶ 3    Battery against a police officer is a serious charge, but being kicked in the legs by a mentally unstable person (causing no serious injury) is not the type of touching that requires either specific or general deterrence. Sometimes, the initial decision to arrest or charge a defendant becomes a boulder rolling downhill, and no one feels strong enough to say, "stop," regardless of the resources wasted. The dissent feels we should not find fault with the officers' actions and theorizes that they had no choice but to wrestle Jackson to the ground and tase him 10 times. *Infra* ¶ 100. But the officers should have received training in how to de-escalate such a situation. The officers did not tase Jackson out of malice, but because they did not know what else to do. The restraint used on Jackson did not assist the paramedics in assessing Jackson's health—how could they do so, after he had been zapped with 50,000 volts? All they could do

was bundle Jackson into an ambulance. The lack of training turned a call for help into a contentious encounter with police.

¶ 4 Prosecutors too should receive training to enable them to distinguish between those responsible for their actions and those, like Jackson, whose vulnerable or abnormal mental state causes them to act in uncooperative or confused ways. We will say it outright—this prosecution was a waste of time and money, all so that Jackson could be sentenced to 18 months of conditional discharge.

¶ 5 Jackson challenges the sufficiency of the evidence. He also contends that several errors occurred during trial, which he asks us to review under the plain error standard. And he claims that his trial counsel was ineffective for failing to preserve those errors.

¶ 6 We find the evidence was legally insufficient to support Jackson's conviction. Further, several errors occurred during trial—the trial court (i) failed to properly question potential jurors during *voir dire*; (ii) erringly admitted other-crimes evidence that Jackson smelled of marijuana; and (iii) erringly admitted opinion testimony from paramedics that Jackson was not having a seizure during the incident. The State in its closing argument relied on this inadmissible evidence, and so did the jury in convicting Jackson. We reverse Jackson's conviction, and the State may not retry him. *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (State may not retry defendant once it has been determined evidence introduced at trial was insufficient to sustain conviction).

¶ 7 BACKGROUND

¶ 8 Before trial, the judge asked each panel of potential jury members whether they disagreed with, or would be unable to follow, the rules of law that (i) Jackson is presumed innocent; (ii) the State has the burden to prove him guilty beyond a reasonable doubt; (iii) Jackson did not need to

present evidence; and (iv) Jackson's failure to testify could not be held against him. The judge did not ask the panels whether they understood and accepted these principles. Jackson's counsel did not object to these questions.

¶ 9    The relevant facts adduced at trial follow.

¶ 10    On December 10, 2010, James Jackson called 911 from his apartment building in Calumet City, and requested an ambulance. Calumet City fire department paramedic Timothy Piepenerink testified that he and his partner, Chris Stapleton, responded to an ambulance call for an unknown medical emergency at about 6:00 p.m. They arrived in a large ambulance labeled "Calumet City Fire Department" and entered the apartment building through the front door into a vestibule. A second door separated the vestibule from the rest of the building. Jackson was behind the second door, and said that he needed an ambulance. When Piepenerink identified himself, Jackson replied, "You are not the ambulance." Piepenerink observed that Jackson seemed "a little bit nervous and kind of upset."

¶ 11    Piepenerink and Stapleton coaxed Jackson outside to show him their ambulance, but Jackson loudly insisted they were not paramedics. Jackson began calling 911, repeatedly asking for an ambulance despite the dispatcher telling him the ambulance was there. Jackson began to yell profanities, so Stapleton requested police assistance. Piepenerink thought Jackson might be suffering from some type of psychological issue: "he was not rational. We couldn't get through to him. *** He was nervous. There was something going on." Stapleton thought that Jackson's "mental status was altered"; Jackson did not follow simple directions and did not seem to be thinking clearly. Piepenerink and Stapleton also noted that Jackson smelled of marijuana.

¶ 12        Jackson tried to go back inside the building but did not have his key for the second door, so he and the paramedics waited in the vestibule area for the police to arrive. During that time, Jackson kept yelling "don't touch me" and appeared agitated.

¶ 13        When Officer Dan Piech arrived, the paramedics met him in the driveway and informed him that Jackson was mentally unstable, or possibly under the influence of an unknown controlled substance. Jackson stayed in the vestibule screaming profanities and "I am not going." Officer Piech tried to calm Jackson and convince him to go with the paramedics, but Jackson kept yelling. Piech reached for Jackson's shoulder; Jackson pulled away and fell backwards, sliding down the vestibule wall to the floor. Jackson then began to punch and kick, in a manner Piech characterized as "defending myself" rather than "violent." Piech tried and failed to handcuff Jackson, while the paramedics attempted to hold down Jackson's legs. During the struggle, Jackson tried to bite Stapleton's arm. But, Stapleton pulled away and Jackson clamped down on Stapleton's sweatshirt. Piech then used his department-issued Taser, in the "dry stun" mode, to stun Jackson with 50,000 volts in the waist area. Normally, using the Taser would make a subject less combative. Piech tased Jackson "about 10 times." On Jackson, the Taser had "no affect whatsoever."

¶ 14        A few minutes later, Officer Gary Wojcik arrived. From outside, he could hear Jackson screaming. Inside the vestibule, Wojcik tried to assist Piech in handcuffing Jackson while the paramedics backed away. To Wojcik, Jackson seemed "irrational." He noticed that the vestibule had a "very strong odor of burnt cannabis," though he did not know where the smell had come from. Jackson kicked Wojcik several times in the lower legs. Wojcik put handcuffs on one of Jackson's wrists; Jackson pulled away, and began punching the glass window in the vestibule. Piech then tased Jackson again, which had no effect. After struggling for several minutes to

subdue Jackson, the two officers succeeded in placing handcuffs on him. Jackson was placed on a stretcher, put in the ambulance, and transported to the hospital. There, Jackson was still unhinged and screaming.

¶ 15　　According to Jackson's longtime girlfriend, Stephanie Stelly, Jackson wore leg braces, and suffered from seizures. Stelly had observed Jackson having seizures 10 to 20 times over the previous seven years, and the seizures did not always present in the same way. On the day of the incident, Stelly returned to the apartment building while Jackson was being placed in the ambulance. She saw blood on Jackson's face. His head was turning from side to side. Stelly had seen that motion before—when Jackson was going into or coming out of a seizure.

¶ 16　　Peipenerink was unable to medically examine Jackson, but opined that Jackson had not had a seizure. Over defense objection, Piepenerink described what was typical of a seizure: "What we have been trained if the patient responds as what we consider, [postictal]. It's a medical term where you just — you are slow *** to respond. They are sluggish. They have no idea where they are at. They can't answer questions. It's kind of slow to respond usually normally." Jackson was vocal and his movements brisk. Piepenerink admitted that he did not know whether Jackson had suffered a seizure before the paramedics arrived and that seizures can take different forms.

¶ 17　　Stapleton also opined, over objection, that Jackson was not having a seizure: "I have never seen a person after post seizure act the way Mr. Jackson did that day. The people coming out of the seizures are more confused. *** Sometimes seem a little aggressive. They are scared. They are more confused, but they just don't [d]o that type of aggression and strength for that matter. Usually when people are having seizures, all of the energy in their body is pretty well spent from the seizure itself, and they don't just physically have the energy to carry on the way

Mr. Jackson did that afternoon." Stapleton believed that someone having a seizure would be unable to bite at another in the manner that Jackson did, or be as vocal as he was, or make the kind of statements Jackson made during the incident. Nor would someone having a seizure continue flailing like Jackson had at the hospital. Stapleton admitted that not all seizures have the same symptoms, and clamping down with the teeth is a symptom of a seizure.

¶ 18　　　　During closing arguments, the prosecutor told the jury that they "heard four witnesses from our side. You heard one witness from the defense side. It's up to you now to judge the credibility." The prosecutor emphasized the paramedics' opinions that Jackson was not having a seizure, noting that Jackson was not charged with biting Stapleton, thereby rendering the paramedics' testimony more credible. Over objection, the prosecutor stated that "maybe smoking a lot of cannabis or something else" could explain Jackson's behavior, and reminded the jury that "at least three different people on the stand *** told you that he smelt strong like cannabis."

¶ 19　　　　The jury pronounced Jackson guilty of battery and resisting a peace officer. Jackson's counsel filed a posttrial motion which did not address (i) the judge's questioning of the jury before trial; (ii) the admissibility of the paramedics' opinion testimony; (iii) the testimony from three of the State's witnesses regarding the odor of cannabis; or (iv) the State's closing argument. The motion was denied, and the trial court sentenced Jackson to 18 months of conditional discharge.

¶ 20　　　　　　　　　　　　　　　　ANALYSIS

¶ 21　　　　　　　　　　　　　　Sufficiency of the Evidence

¶ 22　　　　Jackson contends he was having a medical emergency and lacked the mental state for either knowingly committing battery or knowingly resisting a peace officer. We must decide whether the evidence could reasonably uphold a finding of guilt beyond a reasonable doubt.

*People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). We view the evidence in the light most favorable to the State, and determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Steele*, 2014 IL App (1st) 121452, ¶ 20. We will only reverse a conviction if the proof was so improbable, implausible, or unsatisfactory that reasonable doubt exists as to the defendant's guilt. *People v. Evans*, 209 Ill. 2d 194, 209 (2004).

¶ 23     The trier of fact assesses the credibility of the witnesses, determines the appropriate weight to give the testimony, and resolves inconsistencies in the evidence. *Id.* at 211. Our function on review is neither to retry the defendant nor substitute our judgment for the trier of fact's judgment. *Id.* We will not reverse a conviction based on contradictory evidence presented by witnesses. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 228 (2009).

¶ 24     Battery occurs when, without legal justification, a person knowingly "makes physical contact of an insulting or provoking nature with an individual." 720 ILCS 5/12-3(a)(2) (West 2010). A person resists a peace officer when he or she knowingly resists the performance by one known to the person as a peace officer. 720 ILCS 5/31-1(a) (West 2010). A person acts knowingly when he or she is "consciously aware that that result is practically certain to be caused by his conduct." 720 ILCS 5/4-5(b) (West 2010). Intent, such as knowingness, may be proven by circumstantial evidence, and inferred from the defendant's action and the conduct surrounding it. *People v. Phillips*, 392 Ill. App. 3d 243, 259 (2009).

¶ 25     At trial and on this appeal, Jackson claims he was having an epileptic seizure during the incident, rendering his kicking of Officer Wojcik involuntary. He also claims that due to his mental state, he did not knowingly resist a peace officer. The State maintains Jackson did not present sufficient proof that he was having a seizure.

¶ 26        But even if, as the State suggests, we ignore Jackson's contention that he was having a seizure, the evidence was insufficient to support a finding that Jackson had the requisite mental state to commit these crimes. Rather, there was an abundance of evidence—almost all of it from State witnesses—that Jackson was not "knowingly" acting during the incident. Both paramedics observed, on their arrival, that Jackson was "nervous" and "agitated." Piepenerink thought Jackson was suffering from some type of psychological issue, and Stapleton thought Jackson's mental state was altered. Though the paramedics were in uniform, and driving a vehicle distinctively marked as an ambulance, Jackson repeatedly denied they were paramedics and continued to call 911. Jackson grew more and more upset and neither the paramedics nor Officer Piech could communicate with him. Officer Wojcik arrived, and Jackson kicked him and resisted being handcuffed, but Officer Wojcik immediately recognized Jackson's behavior as "irrational." While, as the dissent points out, Jackson was speaking in complete sentences—*infra* ¶ 85 —those sentences included telling Piepenerink and Stapleton that they were not, in fact, paramedics. Jackson's verbal coherence does not indicate a "knowing" state of mind indicating that he understood what was happening to him.

¶ 27        Whatever the cause of Jackson's behavior—epilepsy, drug intoxication, some undiagnosed mental illness, or being Tasered 10 times—carries no consequence in as much as the State presented little-to-no evidence that Jackson behaved "knowingly." When Jackson was thrashing in the vestibule in a "defending myself" manner, was he "consciously aware" that his thrashing would result in kicking Officer Wojcik? If Jackson did not recognize Piepenerink and Stapleton as paramedics, where was the evidence that he "knew" that Piech and Wojcik were police officers, as the statute requires?

¶ 28    The dissent speculates that, even if Jackson's behavior was caused by voluntary intoxication or mental illness, he would still need to plead that theory as an affirmative defense. *Infra* ¶ 90. But we analyze only the evidence presented by the State, not Jackson's chosen trial strategy—after all, as defendant, Jackson was not required to present any evidence. He could have simply required the State to meet its burden of proof without ever mentioning the word "seizure." We do not know why Jackson was behaving this way, but we do not need to know. Jackson's *mens rea* of "knowing" was an element that the State needed to prove, and it failed to do so.

¶ 29    Jackson's intent can be inferred from his conduct surrounding the battery and resistance, as well as the actions themselves. *Phillips*, 392 Ill. App. 3d at 259. When a defendant behaves "normally," it is simple to make this inference—we assume that a rational person who kicks a police officer, or resists arrest, knows what he or she is doing. But here, all the State witnesses testified that Jackson was not behaving "normally," and so we cannot infer from his actions (as the dissent does) that Jackson was "consciously aware" of what he was doing and the results of his actions. Rather, from the State's witnesses' testimony about his actions and conduct, we can infer that Jackson's intent was not "knowing," in the sense that he was not "consciously aware" of the results of his actions.

¶ 30    The dissent accuses us of sidestepping the seizure argument, and believes that we should limit our analysis to Jackson's trial theory that he was suffering from a seizure. *Infra* ¶ 84. The defense attorney's seizure argument or theory is not evidence. But Jackson challenges the sufficiency of the evidence under the *Jackson v. Virginia* standard, which requires us to examine the essential elements of the crime, and *mens rea* is undoubtedly essential. See *In re Winship*, 397 U.S. 358, 364 (1970) (Constitution protects defendant against conviction except on proof

beyond reasonable doubt of "every fact necessary to constitute the crime with which he is charged"); Illinois Pattern Jury Instructions, Criminal, No. 2.03 (3d ed. 1992) (defendant presumed innocent, and State has burden to prove guilt beyond reasonable doubt). In reversing the convictions, we are not doing Jackson's legal analysis for him, or raising a new claim on his behalf—we merely rely on the legal principles he cited in his brief, and a through reading of the record.

¶ 31    We find the State's evidence establishing Jackson's *mens rea* or mental state, here his knowledge, was so conflicting, so unsatisfactory, as to create reasonable doubt of Jackson's guilt.  Accordingly, the evidence was insufficient to support Jackson's convictions.

¶ 32                                Plain Error Analysis

¶ 33    Jackson alleges several trial errors: (i) the trial court failed to follow Illinois Supreme Court Rule 431(b) (eff. July 1, 2012) and ask potential jurors whether they understood and accepted certain principles; (ii) the trial court should not have admitted evidence that Jackson smelled of marijuana; (iii) the trial court should not have admitted the paramedics' "lay opinion" testimony that Jackson had not had a seizure; and (iv) the State made improper statements in closing argument. Jackson acknowledges his trial counsel failed to preserve these errors; nevertheless, he argues they merit reversal under the plain error doctrine. The burden falls to Jackson to show a clear or obvious error occurred, and either (i) the evidence is so closely balanced that the error, standing alone, threatened to tip the scales against him regardless of the seriousness of the error; or (ii) the error was so serious that it affected the trial's fairness and challenged the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010).

¶ 34    The dissent states that the plain error doctrine is "(over)use[d]." *Infra* ¶ 91. It is not for us to criticize the existence of a doctrine laid out by our Supreme Court (adhered to as recently as

*People v. Sebby*, 2017 IL 119445, ¶ 48) or blame appellate attorneys for using it. (After all, it is rarely the client's fault that his or her trial attorney failed to preserve an error.) And we do not share the dissent's concern that plain error "erodes the proper deference we owe to trial courts." *Infra* ¶ 91. Rather, plain error ensures the integrity of the judicial process and the protection of the defendant's right to a fair trial, and has been codified in Illinois Supreme Court Rule 615(a).

¶ 35                    The Trial Court's Questioning of Potential Jurors

¶ 36        Jackson argues that the trial court's failure during jury selection to ask potential jurors whether they both understood and accepted the principles of Supreme Court Rule 431(b) constitutes plain error.

¶ 37        Supreme Court Rule 431(b) mandates that a trial court ask potential jurors whether they "understand[ ] and accept[ ]" these four principles: (i) the defendant is presumed innocent; (ii) the State must prove the defendant guilty beyond a reasonable doubt; (iii) the defendant is not required to offer any evidence on his or her own behalf; and (iv) the defendant's failure to testify cannot be held against him or her. Ill. S. Ct. R. 431(b) (eff. July 1, 2012); *Thompson*, 238 Ill. 2d at 606. Failure to question the jurors on each of these four principles violates the rule. *Thompson*, 238 Ill. 2d at 607. Further, the trial court should use the words "understand and accept"; asking jurors if they disagree with these principles does not suffice. *People v. Belknap*, 2014 IL 117094, ¶ 46.

¶ 38        During *voir dire*, the trial court neglected to use the words "understand and accept," rather  the judge asked potential jurors if they disagreed with the four principles or would be unable to follow them. The State rightly concedes error. *Id*.

¶ 39                    Evidence of Marijuana Usage

¶ 40       Jackson argues the admission of testimony that both he and the vestibule area smelled of marijuana was plain error. "Other-crimes" evidence may not be admitted to prove a defendant's propensity to commit a crime because a jury might convict the defendant not based on the evidence, but that the defendant deserves punishment. *People v. Placek*, 184 Ill. 2d 370, 385 (1998). Nonetheless, this type of evidence can be admitted to prove intent, *modus operandi*, identity, motive, absence of mistake, or any material fact other than propensity that is relevant to the case. *People v. Donoho*, 204 Ill. 2d 159, 170 (2003). Even when the evidence is admissible, the trial court must weigh its prejudicial effect versus its probative value, and exclude it if too prejudicial. *Placek*, 184 Ill. 2d at 385.

¶ 41       The State argues that the testimony regarding the cannabis smell was relevant to the "continuing narrative" of Jackson's arrest as it informed the actions of both the police and the paramedics. *People v. Thompson*, 2013 IL App (1st) 113105, ¶ 102 (admitting evidence of defendant's marijuana usage where it was "intertwined" with crime). But none of the evidence presented regarding the cannabis smell was, in fact, part of any continuing narrative. Even crimes that occur in close proximity will not be admitted as part of a continuing narrative "if the crimes are distinct and undertaken for different reasons at a different place at a separate time." (Internal quotations marks omitted) *People v. Adkins*, 239 Ill. 2d 1, 33 (2010). Assuming the cannabis smell indicated that Jackson had illegally used marijuana, no medical evidence was introduced as to when or where he had used it, or that he was still under its influence during the incident. There was nothing linking possible marijuana use with Jackson's behavior in the vestibule. The dissent assumes this connection, *infra* ¶ 93, but it was not made by the evidence..

¶ 42       And nothing indicates that the marijuana smell impacted anyone's actions, either Jackson's or the police's and paramedics'. Officer Wojcik testified that the vestibule area

smelled strongly of burnt cannabis, but admitted that he did not know where the smell had come from. Paramedics Piepenerink and Stapleton both testified that Jackson smelled like marijuana. But none of these three witnesses attributed Jackson's irrational behavior to possible marijuana use, and none testified that their own decisions or actions had in any way been influenced by the smell. (In fact, the only person who drew a connection between the marijuana smell and Jackson's behavior was the prosecutor in closing argument, which we will address.) These witnesses consistently testified that Jackson was irrational, uncooperative, and agitated, and that they were not sure why he was behaving the way he did.

¶ 43    The State also argues that the cannabis-smell testimony showed Jackson's actions were intentional, not accidental. The State cites *People v. Haley*, 2011 IL App (1st) 093585, where the trial court admitted evidence that Haley had pushed a fisherman into Montrose Harbor about a month before he pushed another fisherman into the same harbor. *Id*. ¶ 59. We held that this evidence showed that Haley's second action was not accidental or a mistake. But here the State never explained how a smell of cannabis, or cannabis use, could show that Jackson intentionally, rather than accidentally, kicked Officer Wojcik. Unlike Haley, there is no obvious connection between the first action (presumably, Jackson using marijuana) and the second action (kicking Officer Wojcik and resisting arrest). Admission of this evidence was error.

¶ 44    The dissent argues that the smell showed that Jackson's actions were not accidental or involuntary. *Infra* ¶ 92. The dissent does a better job of justifying the use of this evidence than the State did at trial, where, again, it failed to connect Jackson's actions to the marijuana smell through the evidence (instead of speculating during closing argument).

¶ 45    The dissent also argues (based on a hypothetical posed at oral argument) that if Jackson had smelled of alcohol, rather than marijuana, the evidence might have been admissible. *Infra* ¶

93. But again, the State would need to establish its relevance by connecting the alcohol smell to the rest of the evidence. For example, if the police had conducted a field sobriety test, then the smell of alcohol would be admissible to explain their course of conduct. Or, if the paramedics had opined that Jackson seemed drunk, the alcohol smell would have been admissible to justify their opinions. Here, there was no such evidence, either from the police or the paramedics. They testified that Jackson smelled of marijuana, but did not testify that this smell affected their decisions, or suggest that Jackson was high. To repeat, the marijuana smell was irrelevant because the State failed to establish a connection to the rest of the evidence—the State (and the dissent) merely assume one.

¶ 46                    "Lay Opinion" Testimony from the Paramedics

¶ 47        Jackson contends the trial court erred by admitting the medical opinion testimony of Piepenerink and Stapleton that Jackson was not having a seizure during the incident. The trial court did not qualify either paramedic as an expert witness, so Jackson argues they could only offer lay witness testimony.

¶ 48        Lay witnesses can testify based on a rational perception of what they observed if it is helpful for the determination of a fact in issue. Ill. R. Evid. 701(a), (b) (eff. Jan. 1, 2011); *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 42. For example, a lay witness could describe a car accident that he or she observed. *Freeding-Skokie Roll-Off Service, Inc. v. Hamilton*, 108 Ill. 2d 217, 222 (1985). But, lay witnesses cannot testify to an opinion based on scientific, technical, or other specialized knowledge. Ill. R. Evid. 701(c) (eff. Jan. 1. 2011); *Donegan*, 2012 IL App (1st) 102325, ¶ 42. The purpose of a lay witness is to assist the jury in drawing inferences based on the testimony. *Freeding-Skokie Roll-Off Service,* 108 Ill. 2d at 222.

¶ 49    In some circumstances, a lay witness may offer his or her opinion if the facts cannot otherwise be adequately presented so that the jury could "form an opinion or reach an intelligent conclusion" without the witness's opinion. *People v. Novak*, 163 Ill. 2d 93, 102 (1994) (*abrogated on other grounds by People v. Kolton*, 219 Ill. 2d 353 (2006)). Should a lay witness offer an opinion, it must be based on his or her personal observations and recollection of concrete facts, not on specialized knowledge. *Id.* at 103. When the jury as well as the witness can draw the inferences and conclusions, then the witness's opinion is superfluous. For example, a lay witness could describe a car accident, but not opine as to which driver was negligent in causing the accident, because the jury could draw its own inferences from the description. *Freeding-Skokie*, 108 Ill. 2d at 222-23. The opinion testimony also is improper and prejudicial when it goes to the ultimate question of fact to be decided by the jury. *People v. Brown*, 200 Ill. App. 3d 566, 579 (1990) (holding witness opinion testimony about whether complainant engaged in forced or consensual sex was improper and prejudicial because it went to ultimate question of fact).

¶ 50    Expert witnesses differ from lay witnesses—they have experience and qualifications that afford them knowledge beyond the average citizen that aids the jury in weighing the evidence. *Novak*, 163 Ill. 2d at 104. It is within the discretion of the trial court to determine whether a witness has been qualified as an expert. *People v. Jordan*, 103 Ill. 2d 192, 208 (1984). The qualified expert's opinion must be based on scientific theories that have gained general acceptance in his or her field. *Id.* The expert must offer the basis for his or her opinion using a reasoned analysis, or the testimony is rendered invalid. *Lombardo v. Reliance Elevator Co.*, 315 Ill. App. 3d 111, 123 (2000).

¶ 51       Piepenerink's lay opinion testimony was improper under Illinois Rule of Evidence 701, and he was not properly qualified as an expert witness. See Ill. R. Evid. 702 (eff. Jan. 1, 2011). Piepenerink testified: "What we have been trained if the patient responds as what we consider, [postictal]. It's a medical term where you just — you are slow *** to respond. They are sluggish. They have no idea where they are at. They can't answer questions. It's kind of slow to respond usually normally." This testimony went outside of the bounds of Piepenerink's personal observations and recollection of the situation. *Novak*, 163 Ill. 2d at 103; see also Ill. R. Ev. 701 (nonexpert witness must limit testimony to opinions or inferences which are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702"). He provided testimony beyond the common knowledge and experience of a layperson, and offered a speculative opinion based on specialized knowledge. *Novak,* 163 Ill. 2d at 103. His recitation of a technical medical term and its meaning as his basis for determining that Jackson was not suffering from a seizure is not the type of information a jury member or lay person would possess. *People v. Mertz*, 218 Ill. 2d 1, 72 (2006).

¶ 52       Piepenerink was never offered or qualified as an expert on seizures, and only testified to his education and experience as a paramedic. He did testify that he had encountered people having seizures, and received training on how people with seizures behave or react, yet provided insufficient detail on how much training he received on seizures specifically or what the training involved. Unlike the dissent (*infra* ¶ 96), we do not believe that Piepenerink met the qualifications to be admitted as an expert witness in whether Jackson was suffering from a seizure (though he could have been qualified as an expert in paramedic practice). See Ill. R. Ev. 702. He had training as a paramedic, not in the diagnosis of seizures. (And, though the dissent

argues that the paramedics could have been qualified as expert witnesses, *infra* ¶ 96, the State never made this argument in its brief.)

¶ 53    The same applies to Stapleton who testified to his education, training, and experience as a paramedic, but did not testify to having any specialized training in seizures. He was not offered or qualified as an expert. Stapleton testified: "I have seen a lot of people *** having seizures during and after, and I in my career I have never seen a person after post seizure act the way Mr. Jackson did that day. The people coming out of the seizures are more confused *** [m]ore confused, sometime seem a little aggressive. They are scared. They are more confused, but they just don't [show] that type of aggression and strength for that matter. Usually when people are having seizures, all of the energy in their body is pretty well spent from the seizure itself, and they don't just physically have the energy to carry on the way Mr. Jackson did that afternoon." Like Piepenerink, Stapleton's opinion testimony depended on specialized knowledge and training that would not be common knowledge to a layperson. *Mertz*, 218 Ill. 2d at 72. And, it was not admissible as expert testimony because Stapleton was not qualified in that area.

¶ 54    As for Stelly, the dissent asks why her opinion (that Jackson looked like he was coming out of a seizure) was admissible, but Piepenerink's and Stapleton's were not. *Infra* ¶ 97. Stelly's opinion was admissible because hers was *proper* lay opinion testimony under Rule 701. She relied on her own perceptions and memories of Jackson's behavior, and her knowledge of his medical history, but did not purport to rely on any scientific or specialized knowledge gained through training or education. If Piepenerink and Stapleton had limited their testimony to their own observations of Jackson's behavior, it would have been admissible.

¶ 55    The State relies on *People v. Botsis*, 388 Ill. App. 3d 422 (2009), to argue that the paramedics should be allowed to offer their opinions on whether a person is not suffering from a

seizure based on their experience. In *Botsis,* two lay witnesses testified that after a car crash, the driver of one car was convulsing and foaming at the mouth, and opined that the driver had been having a seizure. *Id.* at 442. The lay witnesses in *Botsis* did not rely on specialized training or knowledge, and the court determined such experience was unnecessary because neither witness was attempting a medical diagnosis. *Id.* at 443. But see *Steele v. Provena Hospitals*, 2013 IL App (3d) 110374, ¶¶ 47-49 (trial court abused discretion in allowing lay witnesses to testify that patient's rash "looked like chicken pox," as testimony was functional equivalent of medical diagnosis and witnesses were not qualified as experts).

¶ 56      The State argues that the reverse should be allowable, and that laypersons should be able to opine that a person is not having a seizure. But, this type of opinion would require technical knowledge and skills beyond that of a layperson. While some symptoms, such as convulsions, might indicate a seizure, the absence of a seizure cannot be opined with certainty by a layperson based solely on their observations. The State's theory would lead us down some ridiculous paths. For example, under *Botsis*, a layperson could opine that because John has a bone sticking out of his leg, John's leg is broken. As the State would have it, that same lay person could opine that, since John does not have a bone sticking out of his leg, his leg is not broken— regardless of what might be going on below the skin's surface. We decline the State's invitation to turn lay people into medical experts based on what is obvious to the naked eye.

¶ 57      As lay witnesses, both Piepenerink and Stapleton could have described their observations of Jackson without stating their opinions. Their observations were sufficient to allow the jury members to draw their own conclusions as to whether Jackson was suffering from a seizure. *Freeding-Skokie Roll-Off Service*, 108 Ill. 2d at 222. The admission of these lay opinions was

error because it violated Illinois Rule of Evidence 701 and went to the ultimate question of fact to be decided by the jury. *Brown*, 200 Ill. App. 3d at 579.

¶ 58                                    Prosecutor's Comments in Closing Argument

¶ 59          First, Jackson argues that the prosecutor improperly commented on his failure to testify at trial, and tried to shift the burden of proof, when the prosecutor told the jury they "heard four witnesses from our side. You heard one witness from the defense side. It's up to you now to judge the credibility."

¶ 60          A defendant has the constitutional right not to testify, and therefore a prosecutor cannot comment on the exercise of that right. *People v. Edgecombe*, 317 Ill. App. 3d 615, 620 (2000). The court should consider whether the prosecutor's comment was "intended or calculated" to direct the jury's attention to the defendant's decision. *Id.* Here, the prosecutor did not even mention Jackson, let alone his failure to testify; viewing the prosecutor's statement as a comment on Jackson's failure to testify would require the jury to extrapolate quite a bit. We do not find error in this comment. Cf. *People v. Smith*, 402 Ill. App. 3d 538, 542, 544 (2010) (prosecutor improperly commented on defendant's failure to testify by saying, "[h]ave you heard any evidence that he didn't know" and "[y]ou didn't hear anything from that witness stand").

¶ 61          Similarly, the comments did not improperly shift the burden of proof. While the defense has no obligation to present evidence, the prosecution may comment on evidence that the defendant does present. *People v. Phillips*, 127 Ill. 2d 499, 527 (1989). Merely stating that both sides had presented witnesses, and it was the jury's job to judge the witnesses' credibility is an accurate statement and not improper. *Cf. Smith*, 402 Ill. App. 3d at 542, 544 ("you didn't hear any evidence that he wasn't trying to kill anyone" improperly shifted burden of proof to defendant).

¶ 62        Next, Jackson argues that the prosecutor tried to bolster the credibility of the paramedics by telling the jury that Jackson could have been charged with battery for biting Stapleton, and that "those paramedics have nothing to gain in this case."

¶ 63        Prosecutors may argue the credibility of witnesses. *People v. Williams*, 2015 IL App (1st) 122745, ¶ 12. They may not, however, bolster a witness's credibility with the power of the prosecutor's office, as (i) it might give the jury the impression that "secret" evidence, known only to the State, supports the charge; or, (ii) it might induce jurors to trust the State's judgment over their own evaluation of the evidence. *Id.* ¶ 13. The prosecutor's comment did not do either; the prosecutor simply argued that the paramedics did not have a motive to lie. This is slightly illogical (whether or not the paramedics were the named "victims," they would not gain in any material way from a conviction), but not improper argument.

¶ 64        Jackson further argues that the prosecutor's statement that he could have been charged with battery on Stapleton was not based on the evidence. But Stapleton did testify that Jackson bit him on the arm (getting a mouthful of sweatshirt). The comment was proper.

¶ 65        Next, Jackson argues that in rebuttal closing argument, the prosecutor relied on the erroneously admitted opinion testimony from the paramedics. As explained, this evidence was not proper lay opinion testimony. The closing argument accurately recounted that "two paramedics with training and personal experience and professional experience of seizures tell you that in their opinion, at no point, did they believe that it was a seizure, either before, or during, or after." The prosecutor's rebuttal reference to this testimony exacerbated the prejudicial impact of its admission, and was error.

¶ 66        Jackson argues that in rebuttal closing argument, the prosecutor improperly relied on the "cannabis smell" by theorizing that "maybe smoking a lot of cannabis or something else"

explained Jackson's behavior, and misstated the evidence by telling the jury that at least three witnesses testified that Jackson smelled strongly of cannabis. As discussed, the trial court erred by admitting the cannabis-smell testimony. The prosecutor attempted to connect the cannabis smell to the alleged crimes, but that theory was based on the most tenuous evidence. None of the three witnesses testified that Jackson seemed intoxicated by marijuana. On the contrary, they testified that Jackson's behavior was "irrational," but they did not know why. No medical evidence indicated that marijuana caused, or could cause, Jackson's behavior.

¶ 67 Further, the prosecutor's statement that Jackson had used "something else" other than cannabis was based on no evidence whatsoever. And finally, the prosecutor misstated the evidence in saying that three witnesses testified that Jackson smelled of marijuana. In fact, only Piepenerink and Stapleton testified that Jackson smelled of cannabis; Wojcik testified that the vestibule smelled like cannabis.

¶ 68 At issue was the explanation for Jackson's behavior: there was no dispute that Jackson kicked Wojcik and resisted the officers. Throughout, Jackson's attorney presented the theory that Jackson's behavior had actually been caused by a seizure. The prosecutor needed an alternative explanation that would not undermine Jackson's legal culpability. The explanation theorized—that marijuana use caused agitation and violent outbursts—was not based on the evidence. This was error.

¶ 69            Serious Error

¶ 70 Jackson claims that two of the errors—admission of the other crimes evidence and the State's closing argument—are "serious" errors that affected the trial's fairness and challenged the integrity of the judicial process. *Thompson*, 238 Ill. 2d at 613.

¶ 71        As we have said, other-crimes evidence endangers a fair trial due to the possibility that the jury might convict a defendant as "a bad person who deserves punishment," rather than because the elements of the crime have been proven. *Placek*, 184 Ill. 2d at 385. In light of this danger, other courts have held that erroneous admission of other-crimes evidence could constitute a "serious" error under the plain error doctrine. *People v. Jackson*, 399 Ill. App. 3d 314, 321 (2010); *People v. Norwood*, 362 Ill. App. 3d 1121, 1129 (2005). The State argues that *Norwood* is unpersuasive in that the *Norwood* court ultimately did not review the admission of evidence for plain error. This is because the *Norwood* court held that the evidence was admissible, but also stated that "erroneous admission of such other-crimes evidence could deprive a defendant of a fair trial." 362 Ill. App. 3d at 1129.

¶ 72        The State argues, relying on *People v. Strawbridge*, 404 Ill. App. 3d 460, 468 (2010), that the error cannot possibly be serious enough to meet the second-prong plain error standard as the admission of other-crimes evidence can be reviewed for harmlessness if the error is properly preserved. We disagree with *Strawbridge*, and the State's analysis. Whether an error is reviewed under the harmless error doctrine or the plain error doctrine has nothing to do with the seriousness of the error or the prejudice resulting from it: rather, it is whether the error has been properly preserved. With the exception of "structural" errors (a limited class), any error, no matter how serious or trivial, will be reviewed under the harmless error doctrine if it garnered a contemporaneous objection and inclusion in a posttrial motion. Without that preservation, it will be reviewed under the plain error doctrine.

¶ 73        The State theorizes that a defendant's attorney could "sit" on an error and deliberately leave it unpreserved to avoid harmless-error analysis. Our Supreme Court rejected a similar concern as "fanciful and denigratory to the defense bar." *Sebby,* 2017 IL 119445, ¶ 71. For a

defense attorney to do so would be a bad strategy, for a defense attorney's best and earliest opportunity to avoid prejudice to his or her client involves bringing that error to the trial court's attention, in other words, to preserve the error. Further, the defendant is advantaged by harmless-error analysis, since it is the State's burden to prove the error harmless beyond a reasonable doubt. No competent defense attorney would consider deliberately prejudicing his or her client at trial in the hope that it might later be overturned on appellate review: it would be "a foolhardy gamble with the defendant's liberty." *Id.*

¶ 74 We find that the admission of the other-crimes evidence to be "serious" error. As explained, the evidence of the marijuana smell was purely propensity evidence and of little probative value. Though it had no relevance in explaining Jackson's behavior in the vestibule, the prosecutor exaggerated its importance during closing argument by trying to attribute Jackson's irrationality to marijuana use. This is precisely the type of situation where evidence can "overpersuade" the jury and require a new trial. *Jackson*, 399 Ill. App. 3d at 321-22 (finding admission of evidence of defendant's drug use is "serious" under plain error doctrine).

¶ 75 We also must consider whether the prosecutor's improper comments during closing argument (regarding the marijuana smell and the opinion testimony) constituted "serious" error. Some types of closing argument can rise to this level, such as when the prosecutor makes highly inflammatory comments or misstates the burden of proof. See *People v. Johnson*, 208 Ill. 2d 53, 84 (2003); *People v. Coleman*, 158 Ill. 2d 319, 345 (1994). Not all improper argument is "serious" error under the plain error doctrine. See *People v. Adams*, 2012 IL 111168, ¶¶ 16, 24 (prosecutor's comment that police witness would not risk job by planting evidence was impermissible speculation, but not so serious that it affected fairness of trial). We believe the

prosecutor's comments fall into the latter category: improper, but not so serious that they denied Jackson a fair trial or cast doubt on the reliability of the judicial process.

¶ 76                                    The Evidence Is Closely Balanced.

¶ 77        Next, we must consider whether the evidence was closely balanced. (Though we have already found the evidence legally insufficient.) There is no dispute that Jackson's acts met the *actus reus* elements of battery and resisting arrest; the only question is whether he met the *mens rea* requirement of "knowingly." The State argues that this *mens rea* can be inferred from Jackson's acts of kicking and resisting, and the paramedics' testimony that Jackson was not having a seizure (which we already have held was inadmissible opinion testimony).

¶ 78        Even if we do not consider Jackson's trial theory that he was suffering a seizure, there was substantial evidence indicating that Jackson did not "knowingly" perform those actions. Notably, this evidence all comes from the testimony of state witnesses, and those four witnesses all testified, with remarkable consistency, that Jackson was behaving irrationally throughout this encounter. When the paramedics arrived, Jackson was "nervous," "upset," and "agitated," suffering from some type of psychological issue and an altered mental state. Though Jackson had called for an ambulance, he refused to believe that the uniformed paramedics standing before him were in fact paramedics, and did not recognize the clearly marked ambulance outside the building—going so far as to call 911 yet again for an ambulance that had already arrived. Stapleton flatly stated that Jackson's "mental status was altered" during the encounter. Piepenerink thought that Jackson was either under the influence of some unknown controlled substance or was suffering from some type of psychological issue, and consequently Jackson did not understand what was happening. Officer Piech was told on his arrival that Jackson was "mentally unstable" and possibly under the influence. Officer Piech, like the paramedics, had

difficulty communicating with Jackson. By the time Officer Wojcik arrived, Jackson was screaming and fighting in the vestibule, but even Wojcik recognized Jackson's behavior as "irrational." From all this contradictory evidence, the dissent still concludes that the evidence supported the inference that Jackson "knowingly" committed the crimes. We disagree.

¶ 79      When error occurs in a close case, we will "err on the side of fairness, so as not to convict an innocent person." *People v. Herron*, 215 Ill. 2d 167, 193 (2005); see also *Sebby*, 2017 IL 119445, ¶ 78. The State has conceded that Rule 431 was violated; and though "[i]t is not inevitable that a jury who receives faulty instructions on the *Zehr* principles is biased \*\*\*, it is possible. And if it is possible, it is also possible that those faulty instructions contributed to the result." *Sebby*, 2017 IL 119445, ¶ 78. We still do not know why Jackson behaved as he did that night—whether he was under the influence, having a seizure, or suffering from some unknown psychological issue. The State was required to prove that Jackson acted "knowingly," and the evidence was not there. Importantly, several of the errors we have found (the improper admission of other crimes evidence, the improper lay opinion testimony, and improper closing argument) directly relate to the State's attempt to prove Jackson's *mens rea*. We will not affirm a conviction where the State failed to prove Jackson's *mens rea* or mental state, based on inadmissible lay witness opinion testimony.

¶ 80      Since we are reversing Jackson's convictions, we need not address his arguments that his trial counsel was ineffective.

¶ 81      Reversed.

¶ 82      JUSTICE MASON, dissenting:

¶ 83      The evidence is undisputed that Jackson kicked Officer Wojcik and resisted Officer Piech's efforts to arrest him. The only issue the jury was called on to decide was whether

Jackson acted knowingly, as the State claimed, or whether his actions were the involuntary result of a seizure. Jackson never separately claimed in the trial court that he lacked the mental capacity to act knowingly. Because a rational jury could have concluded that Jackson — who was conscious and speaking coherently, albeit irrationally, during the episode — acted knowingly, there was sufficient evidence to sustain his convictions. Therefore, I respectfully dissent from the majority's decision to reverse Jackson's convictions outright.

¶ 84        In reaching the conclusion that the evidence was insufficient to sustain Jackson's conviction, the majority sidesteps the issue of whether Jackson was having a seizure and instead holds that whatever caused Jackson's behavior—epilepsy, drug intoxication, an undiagnosed mental illness, or being Tasered—is irrelevant given the State's failure to prove that Jackson's actions were knowing. Specifically, the majority concludes that the testimony from the responding officers and paramedics that Jackson was "nervous," "agitated" and "irrational," coupled with Jackson's failure to recognize the ambulance or the paramedics, inexorably leads to the conclusion that Jackson was not consciously aware of his actions. *Supra* ¶ 78. In my view, Jackson's behavior was not inconsistent with acting knowingly, and the evidence was sufficient for a reasonable fact finder to conclude that Jackson had the requisite mental state to commit battery and resist arrest.

¶ 85        As the majority points out, intent is rarely proved by direct evidence, and may be inferred from the defendant's actions and the surrounding circumstances. *Supra* ¶ 24 (citing *Phillips*, 392 Ill. App. 3d at 259). Here, the unrebutted testimony of all four state witnesses established that Jackson was wildly swinging his arms and legs in a confined space while in the presence of uniformed police officers. When Stapleton attempted to assist the officers by holding down Jackson's arm, Jackson tried to bite him. Jackson was also speaking in complete sentences such

as "get away from me," "they are trying to kill me," and "somebody help me." Based on this evidence, it is reasonable to infer that Jackson was consciously aware that his behavior would result and was intended to result in physical contact with those officers. This is particularly true since Jackson kicked Officer Wojcik three to five times in quick succession. The repeated kicking of a person suggests a deliberate, conscious action, rather than the involuntary movements of a mentally ill or seizing patient. This is precisely the inference the jury, as the finder of fact, was entitled to draw.

¶ 86     While Jackson maintains that he presented unrebutted evidence that he was having an epileptic seizure at the time of his arrest (and so could not have acted knowingly), this is an overstatement of the record. To be sure, Jackson's long-time girlfriend testified that Jackson's movement of his head from side to side as he was being loaded into the ambulance was indicative of his behavior when he was going into or coming out of a seizure. However, the paramedics flatly contradicted her testimony. Both Piepenerink and Stapleton testified that Jackson's behavior was not consistent with a patient experiencing a seizure. In particular, they noted that after a seizure, patients are generally sluggish, confused, and slow to respond. Jackson, in contrast, was very vocal and exhibited significant strength as paramedics loaded him into the ambulance and during the trip to the hospital. This conflicting testimony gave rise to a question of fact, which the jury reasonably resolved in favor of the State. See *People v. Simmons*, 2016 IL App (1st) 131300, ¶ 93 (holding that conflict in testimony was the jury's responsibility to resolve).

¶ 87     The majority emphasizes Jackson's irrational behavior in support of its conclusion that no reasonable fact finder could find that his actions were knowing. *Supra* ¶ 26. But a defendant's irrational behavior does not necessarily indicate that he was not consciously aware of the results

of his actions. For example, the consumption of drugs or alcohol may cause a defendant to act irrationally or become agitated, but if that consumption was voluntary, a defendant can still be criminally responsible for his conduct. See 720 ILCS 5/6-3 (West 2012) (intoxicated person is criminally responsible for conduct unless the intoxication is involuntary). Likewise, a defendant who claims to be suffering from a "psychological issue" may be irrational, but he is not automatically relieved of all criminal responsibility for his actions; he must plead and prove that he lacked the capacity to appreciate the criminality of his conduct. *People v. Burnett*, 2016 IL App (1st) 141033, ¶ 46; see also 720 ILCS 5/6-2(c) (2012) (person who was not insane at the time offense committed, but was suffering from a mental illness, is not relieved of responsibility for his conduct, and may be found guilty but mentally ill). Thus, Jackson's irrationality, standing alone, does not render the evidence insufficient to sustain his convictions.

¶ 88　　　　Jackson's defense at trial was that he was having a seizure and, therefore, his actions were involuntary. This was emphasized both in defense counsel's opening statement ("We are talking about a seizure, ladies and gentlemen. If they want to describe that as being out of control, then so be it, but I submit to you that none of his actions were voluntary.") and his closing argument ("If this is movement because of the seizure, if indeed he was having a seizure, then the movements were [involuntary]."). Jackson's counsel repeatedly argued that his client's actions were not "knowing" because they were involuntary. Through the testimony of four witnesses present during the encounter, the State sustained its burden to show, beyond a reasonable doubt, that Jackson's defense—involuntary contact with the police officers as a result of a seizure—was not supported by the evidence.

¶ 89　　　　Consistent with his position during trial, Jackson's posttrial motion specifically argued that the evidence supported his claim that his movements were involuntary—and thus not

"knowing"—because they were the result of a seizure. And in this court, Jackson's briefs do not refer to a mental illness that rendered him incapable of forming the requisite intent. Like the defense he advanced at trial, Jackson argues here that he was unable to control his actions because of a seizure: "[T]he evidence presented at trial demonstrates that Jackson's conduct was involuntary, inadvertent or accidental because he was suffering from an epileptic seizure after he called 911. Thus, *he was incapable of controlling his body* and his act of kicking was an involuntary act for which he cannot be held accountable." (Emphasis added).

¶ 90    Despite the lack of any argument regarding Jackson's mental capacity advanced in the trial court or on appeal, the majority reverses Jackson's conviction outright based on its conclusion that Jackson suffered from some unidentified mental condition that rendered him incapable of acting knowingly. But Jackson never requested that the jury be instructed regarding a verdict of guilty but mentally ill. See Illinois Pattern Jury Instructions, Criminal, No. 24-25.01I (4th ed. 2000). And there was no testimony at trial that, apart from seizures, Jackson suffered from any mental illness. Thus, the majority conflates Jackson's claim that he lacked control over his bodily movements because of a seizure with a different defense—never raised at trial—that Jackson lacked the mental capacity to intentionally commit a battery or resist arrest based on his "irrational" behavior. Because this issue was never raised by Jackson, we should refrain from addressing it. *People v. Givens*, 237 Ill. 2d 311, 323 (2010) ("'a reviewing court should not normally search the record for unargued and unbriefed reasons to *reverse* a trial court judgment'" (emphasis in original) (quoting *Saldana v. Wirtz Cartage Co.*, 74 Ill. 2d 379 (1978))).

¶ 91    I would further find that none of the other trial errors identified by Jackson warrants a new trial. In the first place, none of the errors Jackson cites—the admission of testimony regarding (1) the cannabis smell, and (2) opinion testimony from the paramedics that Jackson

had not had a seizure; prosecutorial misconduct during closing argument; and failure to comply with Rule 431(b)—was properly preserved. Accordingly, Jackson urges us to review for plain error and makes a separate claim of ineffective assistance of counsel.  I am troubled by the continued (over)use of these methods to review unpreserved error, as it erodes the proper deference we owe to trial courts.  For example, had it been properly preserved, we would review the admission of the "other crimes" evidence (*i.e.* the cannabis smell), as well as the paramedics' opinion testimony, for an abuse of discretion.  See *People v. Williams*, 238 Ill. 2d 125, 136 (2010); *Simmons*, 2016 IL App (1st) 131300, ¶ 135. And, as I discuss below, I would be unable to find an abuse of discretion on either issue. But an assertion of plain error requires us to undertake what is essentially *de novo* review of rulings that the trial court was never asked to make and is better equipped to address.  See *People v. Downs*, 2015 IL 117934, ¶ 15 (in determining whether an error occurred for purposes of undertaking plain error analysis, standard of review is *de novo*). Plain error is "a narrow and limited exception" to procedural forfeiture and is "not a general saving clause preserving for review all errors affecting substantial rights ***." (Internal quotation marks omitted) *Herron*, 215 Ill. 2d at 177. The habitual use of plain error to reach forfeited issues contravenes our supreme court's definition of the doctrine and renders the exception the rule.

¶ 92        In any event, even under plain error review, I do not believe any of these alleged errors warrant a new trial.  Initially, I find no error in the admission of evidence regarding the cannabis smell or the paramedics' testimony that Jackson was not suffering from a seizure.  With regard to the testimony of the two paramedics that Jackson smelled of cannabis, I do not agree that this was inadmissible "other crimes" evidence.  Our supreme court has held that while evidence of other crimes may not be used to show a defendant's propensity for criminal conduct, it may be

used to show that "the act in question was not performed inadvertently, accidently, involuntarily, or without guilty knowledge." *People v. Wilson*, 214 Ill. 2d 127, 136 (2005). The latter was precisely the purpose of the State's use of the cannabis evidence here: the State argued that Jackson's actions could be attributed to marijuana use and thus were not accidental or involuntary: "Maybe smoking a lot of cannabis or something else could be the reason why you're out of control ***."

¶ 93    Contrary to the majority, I find an obvious connection between Jackson's use of marijuana and his actions of resisting arrest and kicking a police officer. The use of illicit drugs (or any mind-altering substance) may result in irrational behavior of the type Jackson exhibited. Indeed, at oral argument, Jackson's counsel conceded that, had Jackson smelled of alcohol rather than marijuana, the paramedics could have testified to that fact because that is part of assessing the patient's condition. I see no difference between the two scenarios; in either case, the testimony leads to the inference that Jackson consumed a substance that could have caused his irrational behavior.

¶ 94    Turning to the paramedics' testimony that Jackson was not suffering from a seizure, I disagree with the majority's characterization of this as improper "lay opinion" testimony. The majority's conclusion rests on its belief that the paramedics were lay witnesses rather than experts, and thus could not offer opinions based on specialized knowledge. *Supra* ¶¶ 51-53 (citing Ill. Rs. Evid. 701, 702). But our supreme court has held that lay witnesses who offer an opinion based on specialized knowledge may become expert witnesses once properly qualified. *Novak*, 163 Ill. 2d at 104.

¶ 95    In *Novak*, the State expressly denied at trial that its two rebuttal witnesses were experts and elicited opinions from them as lay witnesses. *Id.* at 99. While the supreme court initially

held that the witnesses' testimony was inadmissible as lay opinion testimony, it concluded that the State established the witnesses' qualifications as experts, and as such, the admission of their testimony was not error. *Id*. at 102, 104. In reaching its conclusion, the supreme court explained:

> "An individual will be permitted to testify as an expert if that person's experience and qualifications afford him or her knowledge that is not common to laypersons and where such testimony will aid the fact finder in reaching its conclusion. [Citation.] The indicia of expertise is not an assigned level of academic qualifications. Rather, the test is whether the expert has knowledge and experience beyond the average citizen that would assist the jury in evaluating the evidence. [Citation.]. The expert may gain his or her knowledge through practical experience rather than scientific study, training, or research. There is no precise requirement as to how the expert acquires skill or experience. [Citation.] *Id.* at 104.

¶ 96    Here, just as in *Novak*, the State elicited testimony from both Piepenerink and Stapleton that revealed both had the education and practical experience to allow them to testify as experts. Piepenerink testified that he was certified as a paramedic after attending paramedic school for eight to nine months and completing field training, which was conducted in a hospital. He went on to testify that he received training on how people with seizures "behave or react" and that in his five years as a paramedic, he had attended to and assisted "a thousand" people having seizures. Stapleton likewise testified that he had been a licensed paramedic for eight years. His training consisted of 13 months of classroom work, multiple hours of ER time, and working with different units of the hospital. Stapleton had seen over 100 people having seizures and emerging

from them. While neither Piepenerink nor Stapleton had training in the diagnosis of seizures, both had "knowledge and experience beyond the average citizen" (*id*.) regarding how seizure patients behave. Indeed, Stapleton testified that had he believed Jackson was suffering a seizure, he would not have touched him as paramedics are trained not to attempt to control a patient's movements during a seizure. In my view, this testimony was sufficient to render both paramedics experts in the recognition of symptoms of a seizure, and the trial court did not err in allowing them to express their opinions.

¶ 97    Again, by invoking plain error and urging *de novo* review on this issue, Jackson avoids the hurdle he would have otherwise faced to establish that the trial court abused its discretion in determining that these witnesses were qualified by training and experience to opine that Jackson was not suffering from a seizure when he kicked Wocjik and resisted Piech's efforts to arrest him. There is no basis to distinguish Stelly's opinion testimony that Jackson's head movements looked like he was either going into or coming out of a seizure—which the majority deems admissible—from the testimony of trained paramedics that he did not appear to be suffering a seizure. The jury was entitled to consider all of the opinion testimony in determining whether Jackson, as he claimed, was suffering from a medical condition that rendered his bodily movements involuntary.

¶ 98    Jackson's final allegations of trial error concern the prosecutor's closing arguments and the trial court's questioning of potential jurors. The majority agrees with Jackson that the prosecutor's comments during closing regarding the paramedics' testimony that Jackson was not suffering from a seizure as well as the reference to the cannabis smell were in error, again based on its finding that this evidence should not have been admitted. But because I believe that the

testimony on both issues was properly admitted, I likewise do not find these comments erroneous.

¶ 99    And with regard to the trial court's questioning of the jurors during *voir dire*, while I agree with the majority that the court erred in failing to strictly comply with Rule 431(b), I do not agree that this amounted to plain error, as I do not believe the evidence was closely balanced. The State presented evidence that supported the inference that Jackson's actions in kicking Officer Wojcik and resisting arrest were knowing, whereas Jackson's contention that he was having a seizure was supported only by the weak testimony of his girlfriend who was not present at the time of the events.  Moreover, Stelly did not know whether Jackson was going into or coming out of a seizure when she saw him on the stretcher.  And if he was going into a seizure at that time, then his actions in the vestibule (which Stelly did not see) cannot be attributed to that condition.  Under these circumstances, the evidence was not closely balanced so as to require reversal.  See *People v. White*, 2011 IL 109689, ¶ 139 (undertaking qualitative rather than "strictly quantitative" "commonsense assessment of the evidence" to determine that the evidence was not closely balanced).

¶ 100    Finally, I do not join in the majority's criticism of the law enforcement officers and prosecutors involved in this case.  Although the majority chides the officers for not de-escalating the situation, my colleagues offer no suggestions as to what the officers should have done. Certainly, the paramedics and police officers could not simply have left the scene as Jackson called 911 requesting an ambulance, presumably for a medical emergency. Further, because Jackson's aggressive behavior prevented the paramedics from assessing him medically, it was necessary to subdue him and so police were contacted. And when two uniformed police officers were unable to handcuff Jackson because he was fighting them, it was reasonable for Piech to

use his Taser (the first time he had done so in his more than 19-year career) to attempt to get Jackson under control, ultimately to no avail. Based on my reading of the record, Piech used his Taser twice, once without darts and once with. Neither had any effect on Jackson, so the majority's characterization of Jackson as being "zapped with 50,000 volts" (*supra* ¶ 3) is irrelevant. And the jury in this case was instructed, without objection, that the arresting officers were not required to retreat or desist in an effort to make a lawful arrest because of Jackson's efforts to resist and that they were justified in the use of any force reasonably necessary to effect his arrest and defend themselves from bodily harm. See Illinois Pattern Jury Instructions, Criminal, No. 24-25.12 (4th ed. 2000). They do not deserve criticism for doing what the law entitles them to do.

¶ 101    Although the majority likens this case to those involving citizens suffering from mental illness, there is, as noted, absolutely no evidence in the record that Jackson was mentally ill and he did not assert any such defense at trial.  Thus, I cannot find fault with the officers for their treatment of an aggressive, irrational individual, nor do I join in my colleagues' criticism of the prosecutors involved in this case for pursuing charges against a person who attacked both the paramedics he called to help him and the officers who responded to the scene.

¶ 102    I would affirm.