2022 IL App (2d) 210245-U
Nos. 2-21-0245 & 2-21-0246 cons.
Order filed July 18, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Nos. 19-CF-347 |
| | ) | 19-CM-523 |
| | ) | |
| LISA M. MORRISSETTE, | ) ) | Honorable Robert P. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: (1) The State proved beyond a reasonable doubt that defendant's kicking a sheriff's deputy as he tried to restrain and handcuff her was a knowing act, not a reflexive act as she claimed occurred when the deputies jumped on her back as she lay on the floor.  (2) Trial counsel was not ineffective for failing to counteract the State's cross-examination of defendant on her claim that she wet her pants when the deputies jumped on her back.  Video of defendant inside the squad car after her arrest suggests she did wet her pants, but whether she did so was, in any event, ancillary to the issue of whether she knowingly kicked the deputy.

¶ 2    Following a jury trial, defendant, Lisa M. Morrissette, was convicted of aggravated battery

(720 ILCS 5/12-3.05(d)(4) (West 2018)), resisting a peace officer (*id.* § 31-1), and violation of an

order of protection (*id.* § 12-3.4(a)).[1]  She was sentenced to concurrent terms of 30 months' probation and 180 days in jail for aggravated battery and two concurrent terms of 24 months' conditional discharge on the other two offenses.  On appeal, defendant takes issue only with her aggravated battery conviction.  She argues that (1) the State failed to prove beyond a reasonable doubt that she knowingly kicked one of the deputies who was arresting her, and (2) her trial counsel was ineffective for failing to investigate and present readily available evidence that would have supported defendant's testimony and rebutted the State's impeachment of her credibility.  We determine that (1) the State proved beyond a reasonable doubt that defendant acted knowingly and (2) defendant's trial counsel was not ineffective, as, among other things, the State's evidence to which defendant refers was not impeaching.  Accordingly, we affirm.

¶ 3                               I. BACKGROUND

¶ 4      The record indicates that defendant has a history with Kendall County officials.  This history includes proceedings in Kendall County circuit court in which custody of defendant's daughter was granted to the daughter's father.  Because of this and related proceedings, defendant claimed that Kendall County officials have "abused" her and her daughter.

¶ 5      Defendant's interaction with Kendall County officials continued with this case.  The indictment charging defendant with aggravated battery alleged

"[t]hat on or about October 11, 2019, *** [defendant] committed ***
AGGRAVATED BATTERY *** in that said defendant, knowing David Angerame to be
a peace officer performing his official duties, committed a battery *** in that said

_____

[1]Case No. 2-21-0245 (19-CF-347) concerns the aggravated battery.  Case No. 2-21-0246 (19-CM-523) concerns the resisting a peace officer and the violation of an order of protection.

defendant kicked Deputy David Angerame in his right knee, causing him to fall to the ground."

¶ 6 Before trial, the parties filed three motions *in limine* concerning defendant's history with Kendall County officials. Defendant filed motions *in limine* to bar the State from presenting evidence of (1) defendant's prior contact with the Kendall County deputies who responded to the residence on the day of the incident, and (2) an active "warrant/body writ" issued against her in another case. The State filed a motion *in limine* to bar defendant from "mentioning, introducing or attempting to introduce evidence of, or arguing, personal opinions about the Kendall County [j]udicial [s]ystem or Kendall County [l]aw [e]nforcement." In its motion, the State referenced a squad-car video of defendant's transport to the police station after her arrest for the October 11, 2019, incident. According to the State, the recording depicts defendant in the backseat, yelling about Kendall County officials abusing her and her daughter. On the date set for hearing on the motions, the parties informed the court that they had "discussed the motions [and] both agreed to the motions."

¶ 7 Evidence at trial revealed that defendant met Robert Ziemer in 2013 when he was looking for a driver for his taxi company. The two became romantically involved. Defendant moved into Ziemer's home and began running his business. Several years later, the parties' relationship soured. In September 2019, Ziemer obtained an order of protection directing defendant to move out of Ziemer's home by 5 p.m. on October 11, 2019.

¶ 8 At around 5 p.m. on October 11, 2019, defendant had not moved out of Ziemer's home. Ziemer called the Kendall County Sheriff's Office, whose deputies patrol the area. When the deputies arrived, they saw that defendant was locked in a room at the back of the home. They told defendant that she needed to let them in. Defendant refused. Eventually, after the deputies

removed a glass panel on one of the French doors to the room and Ziemer broke the door's lock, Deputies David Angerame and Nicholas Albarran entered the room. Both men were in full police uniform.

¶ 9    Defendant was sitting in the corner to the left of the entry, hunched forward with her elbows tucked into her body. She was behind a rack of clothes that "kind of" hid her from the entry door. The deputies told defendant that the order of protection prohibited her from remaining in the house. Defendant, who was 5 feet tall and weighed 100 pounds, started screaming loudly in "an aggressive manner" and refused to leave. Angerame told defendant to stand up. She refused. Angerame grabbed defendant's left arm and told her again to stand up. Defendant again refused, pulling her arm in toward her body and screaming for Angerame to stop abusing her.

¶ 10    Eventually, Angerame and Albarran stood defendant up. She continued to struggle and resist, so the deputies attempted to place her on her stomach so that they could get better leverage and handcuff defendant. Defendant was tensing her body, which made it difficult to move her to the ground. Angerame was asked, "Once you decided to put her on the ground, what position did you put her on the ground from?" He responded, "Standing position, put her down like in front of her so she was on her stomach."

¶ 11    When the deputies "kind of like" moved defendant to a "hands and knees type position," Angerame stood to the left and slightly behind defendant while Albarran stood on her right. Angerame hunched over defendant by standing on both feet and bending forward at the waist to a 90-degree angle, while defendant, who was still on her hands and knees, continued to struggle. Angerame had a handcuff on defendant's left wrist. "[A]t some point" during that time, defendant "kicked" Angerame "with her left leg."

¶ 12    Angerame explained that defendant "kicked backwards" while she was on her hands and knees in a crawling-like position. He testified that, from this position, defendant was "able to kick her leg up." Albarran testified that defendant "kicked in a forceful manner in a donkey-like fashion" and "struck [Angerame] in the right knee." Albarran indicated that, from her hands-and-knees-position, defendant was able to "extend her left leg fully" and strike Angerame. Albarran demonstrated that defendant "push[ed] [her leg] straight back [and] parallel with the ground." Angerame stated that defendant's kick "[f]orced [his] knee to go back." Angerame "lost balance and fell on the ground." Albarran testified that Angerame "staggered" and fell on his right knee. Albarran stated that, after Angerame fell, "[defendant] continued to attempt to kick [Angerame] further." According to Albarran, defendant "tried to kick [Angerame] more than once."

¶ 13    Defendant continued to struggle and scream that the deputies should stop abusing her. After she kicked Angerame, defendant "attempted to bite [Albarran's] left hand which was on her shoulder." Albarran elaborated that "[defendant] turned her head to the right facing her shoulder and then continued to—in a motion try to hold her mouth, trying to bite [his] hand as [Albarran] was pulling her down."

¶ 14    Angerame stated that, because defendant was "flailing all over the place" and striking her head against the ground, Deputy Brian Kramer came from an adjacent room to aid Angerame and Albarran. Kramer held defendant's head to the ground, and the other deputies moved defendant to the floor, laying her on her stomach. They "placed her on the ground and she was not trying to kick anymore."

¶ 15    Once the deputies finished handcuffing defendant, she continued to struggle. The deputies escorted her to a squad car, placed her in the backseat, and closed the door. According to Ziemer, Angerame, and Albarran, the deputies never threatened defendant.

¶ 16    Albarran testified that, after the deputies closed the squad car door, he heard kicking coming from inside the car.  The State then offered State's exhibit No. 5, "the squad [car] video," which was admitted without objection.  The State asked for permission to "publish a small portion of that video," and the trial court granted it.  State's exhibit No. 5 is a 20-minute video of defendant in the backseat of the squad car.  When it introduced the exhibit, the State did not clarify which part of the video it would publish to the jury.  At sentencing, however, the State noted that it had introduced at trial the "excerpt" that "involved the defendant kicking [the] squad door."  The State then introduced, for sentencing purposes, State's exhibit C, "the full squad video."  State's exhibit C appears to be identical to State's exhibit No. 5.  We restrict our review of State's exhibit No. 5 to the portion that the State intended to introduce, namely that showing defendant kicking the interior of the squad car (the backseat video).  At about 1 minute and 20 seconds into State's exhibit No. 5, defendant kicks the passenger door with her left leg a few times.  As she does so, a large wet spot is visible on the inside left thigh of her light-colored blue jeans.

¶ 17    Defendant moved for a directed verdict, arguing that the State failed to establish beyond a reasonable doubt that she knowingly kicked Angerame.  In support of her argument, defendant claimed that "[Angerame's] specific testimony [was] [defendant] was flailing all over the place."  The trial court denied the motion for a directed verdict.

¶ 18    Before proceeding with defendant's case, defense counsel asked "that we take a break for a few minutes so [defense counsel] can speak with [defendant] prior to her deciding whether she wants to take the stand or not."  The trial court advised defendant of her right not to testify and then gave her time to talk with counsel.  When the case was recalled, defense counsel told the court that defendant wanted to testify.  Counsel also indicated that she "would like to make a record *** [that] this decision is made over—or against my advice."  The court again admonished defendant

that she did not have to testify. Defendant persisted that she wished to testify and the court noted defense counsel's concern.

¶ 19 Defendant testified that she (1) knew the details of the order of protection, (2) did not let the deputies into the room, and (3) was sitting in the corner of the room in a fetal position when the deputies entered. She stated that she did not want to leave because Ziemer's house had been her home for several years. She did not let the deputies into the room or comply with their orders because she felt threatened and scared. Defendant also admitted that she started screaming when the deputies tried to put her under arrest. She did so because she was "really frustrated," "upset," and "very angry." She called 911 while the deputies were there.

¶ 20 Defendant denied that she ever intentionally kicked Angerame. She testified that when the deputies pushed her to the ground, she fell on her stomach, and the deputies jumped on her back. They did so with such force that it "caused [defendant's] bladder to like go" and her "reflexes were up." The kick that struck Angerame "just happened as a result of them jumping on [her] back." Thus, defendant claimed that she reflexively, not intentionally, kicked Angerame. Defendant stated that "[Angerame] was standing behind [her] foot, like waiting for [her] foot to go up to like press charges on [her]."

¶ 21 On cross-examination, defendant was asked several questions about whether she urinated on herself when the deputies jumped on her back. She was shown the backseat video and was asked, "Do you see any wet spot on those jeans?" Defendant replied, "Oh, yeah, it was all over the back of my pants, absolutely." The State followed up with questions about whether the dampness from urine would be visible on the back of her pants if she was lying on her stomach when she wet her pants. For instance, the State asked if, by jumping on her back, the deputies

"[c]aus[ed] the urine to go up towards the rear of [her] pants."  Defendant replied, "I don't know.
It was just all over the back of my pants."

¶ 22    After defendant testified, the defense rested.  In rebuttal, the State presented defendant's
call to 911 as well as Ziemer's call to the Kendall County Sheriff's Office.

¶ 23    During the jury instruction conference, defendant submitted Illinois Pattern Jury
Instructions, Criminal, No. 5.01B (4th ed. 2000), which defines "knowingly."  The State objected
to the trial court giving this instruction.  Although the court reserved ruling on defendant's tendered
instruction, it eventually refused to give the jury that instruction.  However, the court indicated
that it would give the instruction if the jury asked a question about "knowingly" during
deliberation.[2]

¶ 24    In closing argument, the State commented on defendant's credibility.  It stated:

> "And then we have the testimony of the defendant.  I'm just minding my own
> business, curled in a ball in the corner of a room.  Because I was threatened by officers
> telling me to do I know what I had to do.  And I wasn't doing anything wrong.
>
> Next thing I know, I'm on my stomach and they are jumping on my back causing
> me to pee in my pants.
>
> That's ridiculous.  You've seen the video twice of her kicking in the squad car.
> Doesn't looked [*sic*] like she peed in her pants there."

¶ 25    Defense counsel never commented in closing on whether the backseat video showed
dampness from urine on defendant's jeans.  Likewise, the State did not mention in rebuttal that
defendant wet her pants.

¶ 26    The trial court instructed the jury, in part:

---

[2]The jury had no question about "knowingly," so the instruction was not given.

> "Neither opening statements nor closing arguments are evidence and any statement or argument made by the attorneys which is not based on the evidence should be disregarded."

¶ 27    The jury found defendant guilty. Defendant moved for a new trial, arguing that she was not proved guilty beyond a reasonable doubt. The trial court denied the motion. Defendant was sentenced, and this timely appeal followed.

¶ 28    Although not admitted at trial or mentioned during the proceedings, included in the record on appeal is a video recorded by the dashboard camera of the squad car where defendant was placed after her arrest (the dashboard video). Defendant can be heard screaming or mumbling in the background. At times, she complains that the police are harassing her, abusing her daughter, or failing to address more pertinent criminal cases, like those involving drug dealers or gangs. Also audible on the dashboard video are some of the deputies' conversations. The deputies talk about how defendant fought them and kicked one of them. Also, very quietly, one deputy mentions that defendant "pissed" her pants. Another deputy responds, "Yeah." Which deputies made these statements is unknown.

¶ 29                                II. ANALYSIS

¶ 30    Two issues are raised in this appeal. First, defendant argues that the State failed to prove beyond a reasonable doubt that she knowingly kicked Angerame. Second, she argues that her trial counsel was ineffective for failing to introduce the dashboard video, in which the two deputies comment that defendant "pissed" her pants. Defendant claims that the dashboard video, which clearly depicts a wet spot on the inside left thigh of her jeans, would have rehabilitated the credibility of her testimony that she wet her pants while the officers restrained her. We address each issue in turn.

¶ 31                                    A. Reasonable Doubt

¶ 32    "It is well settled that, when reviewing a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis and internal quotation marks omitted.) *People v. Cline*, 2022 IL 126383, ¶ 25. "All reasonable inferences from the evidence must be drawn in favor of the prosecution." *Id.* "This court will not reverse the trial court's judgment unless the evidence is so unreasonable, improbable, or unsatisfactory as to create a reasonable doubt of the defendant's guilt." *Id.*

¶ 33    Defendant argues that the State failed to prove her guilty of aggravated battery beyond a reasonable doubt. A defendant commits aggravated battery as charged here when, (1) in committing a battery other than discharging a firearm, (2) she knows that the person battered is a peace officer. 720 ILCS 5/12-3.05(d)(4) (West 2018). Defendant does not deny that she knew Angerame was a peace officer. She denies, rather, that she committed a battery. A defendant commits battery when she knowingly and without legal justification (1) causes bodily harm to another or (2) makes physical contact with another that is insulting or provoking. *Id.* § 12-3(a).

¶ 34    Defendant argues that she did not act "knowingly." "A defendant acts with 'knowledge' when she is 'consciously aware' that her conduct is 'practically certain' to cause the result." *People v. Trajano*, 2018 IL App (2d) 160322, ¶ 23 (quoting 720 ILCS 5/4-5(b) (West 2020)). "Knowledge is usually proved by circumstantial, rather than direct, evidence." *Trajano*, 2018 IL App (2d) 160322, ¶ 24. "Thus, knowledge may be established by evidence of the defendant's acts, statements, or conduct, as well as the surrounding circumstances, that supports a reasonable

inference that the defendant was consciously aware that the result was practically certain to be caused." *Id.*

¶ 35 "Whether a defendant acted with knowledge is a question of fact." *Id.* ¶ 23. Questions of fact are resolved by the finder of fact, which in this case was the jury. See *People v. J.S.*, 103 Ill. 2d 395, 409 (1984).

¶ 36 With these principles in mind, we turn to the facts presented in this case. Viewing the evidence in the light most favorable to the State, which we must do (*Cline*, 2022 IL 126383, ¶ 25), we conclude that defendant knowingly kicked Angerame. The evidence revealed that defendant knew the details of the order of protection and did not want to leave Ziemer's home. She remained in the home past the time indicated on the order of protection, and she refused to leave not only when the deputies arrived but even after they forced their way into the room she was in. Moreover, she admitted that she was angry that she was required to leave.

¶ 37 When it became apparent that defendant was not going to leave, deputies Angerame and Albarran attempted to handcuff her, as she was then under arrest for, at a minimum, violating the order of protection. The deputies stood on either side of defendant, with Angerame standing on the left and slightly behind her. Defendant admitted that she was aware of where Angerame was standing. Angerame handcuffed one of defendant's hands and then defendant, who was on her hands and knees, drew her left leg up, pushed it straight back, and donkey-kicked Angerame. The kick was so forceful that Angerame lost his balance and fell on his knee. Defendant continued trying to kick Angerame and also tried to bite Albarran. After she was handcuffed and placed in the backseat of the squad car, defendant repeatedly kicked the passenger door.

¶ 38 Supporting our conclusion that defendant knowingly kicked Angerame is *People v. Rickman*, 73 Ill. App. 3d 755 (1979). There, the defendant was charged with, among other things,

aggravated battery in that he knowingly kicked a Montgomery Ward security manager. *Id.* at 756-57. Evidence at the bench trial revealed that the security guard chased the defendant because the guard believed that the defendant had stolen merchandise. *Id.* A police officer saw what was happening, helped the guard restrain the defendant, and handcuffed one of the defendant's wrists. *Id.* at 757. While the defendant was struggling to prevent the officer from handcuffing his other wrist, the defendant fell on top of the guard, breaking the guard's ankle. *Id.* After the defendant was convicted and sentenced, he appealed, arguing, among other things, that he was not proved guilty beyond a reasonable doubt of battering the security guard. *Id.*

¶ 39 The appellate court affirmed. *Id.* at 760. In doing so, the court addressed the defendant's argument that he did not "knowingly cause[ ] great bodily harm to [the security guard]" because, when the security guard was injured, the defendant was "attempting to escape, not harm [the guard]." *Id.* at 759. The court found the defendant's argument unavailing:

"The only mental state required is that the accused knowingly and intentionally cause the social harm defined in the statute[.] No premeditation or malice being necessary. In order for the defendant to be proved guilty of aggravated battery, the State need only show that he knowingly scuffled with [the security guard] and that [the guard] received great bodily harm as a result of the scuffle. That the defendant did not intend to break [the guard's] ankle is immaterial; he did intend to scuffle with [the guard] and he must accept responsibility for the result of the scuffle. Anyone who engages in a scuffle must be deemed to be aware that someone may be injured as a result." (Internal quotations and citation omitted.) *Id.* at 759-60.

¶ 40 This case is even stronger than *Rickman*. Here, not only, like in *Rickman*, does the evidence establish that defendant struggled with the deputies to prevent them from removing her from

Ziemer's home, but the evidence also reveals that defendant knew she was kicking Angerame when she drew her leg up, pushed it straight back, and kicked Angerame's knee.

¶ 41    Defendant argues that this case is more like *People v. Jackson*, 2017 IL App (1st) 142879, and *People v. Martino*, 2012 IL App (2d) 101244. We disagree. In *Jackson*, a police officer was kicked by the defendant, who was "thrashing" around after being tased; the defendant might also have been suffering from a medical condition or under the influence of a drug. *Jackson*, 2017 IL App (1st) 142879, ¶ 27. In *Martino*, the defendant's wife was injured when the defendant was tased and fell on her. *Martino*, 2012 IL App (2d) 101244, ¶ 6. At issue in both cases was whether the defendant acted knowingly given that the contact with the victim was involuntary. *Jackson*, 2017 IL App (1st) 142879, ¶ 26; *Martino*, 2012 IL App (2d) 101244, ¶¶ 6, 14. Both this court in *Martino* and the First District in *Jackson* concluded that the defendant did not act knowingly. *Jackson*, 2017 IL App (1st) 142879, ¶ 26; *Martino*, 2012 IL App (2d) 101244, ¶ 15.

¶ 42    Here, unlike in *Jackson* and *Martino*, defendant had not been tased, nor was there evidence that she was under the influence of a substance or suffering from some medical condition. While defendant agrees, she claims that the deputies' act of jumping on her back while she was lying on her stomach caused her to reflexively, not knowingly, kick Angerame—like the involuntary acts in *Jackson* and *Martino*. We need not resolve whether the scenarios in *Jackson* and *Martino* are the same or similar to defendant kicking Angerame. Viewing the evidence in the light most favorable to the State, defendant was on her hands and knees, not on her stomach on the floor, when she kicked Angerame. Thus, even if the reflexive kick she described would have resembled the involuntary actions in *Jackson* and *Martino*, that kick would have occurred *after* she knowingly kicked Angerame.

¶ 43    In reaching our conclusion, we note that defendant contends that "[t]estimony from both the [deputies] and [defendant] shows that [defendant's] foot made contact with Angerame while she was face down on the floor and the police were attempted [*sic*] to handcuff her." Defendant also claims that Angerame testified that defendant was " 'flailing all over the place' " when he was kicked. The record does not support either contention. First, both Angerame and Albarran testified that defendant kicked Angerame when she was on her hands and knees. Although Angerame testified that the deputies "put [defendant] down like in front of her so she was on her stomach," that statement was made in response to a question about "what position" the deputies "put her on the ground from." Angerame and Albarran agreed that, when they lowered defendant from a standing position, she did not initially lie with her stomach to the floor. Rather, she was first on her hands and knees—from which position she kicked Angerame—and then went onto her stomach. Second, although the record reflects that defendant struggled with the deputies, Angerame's testimony about defendant "flailing" around concerned her actions after she was lowered to the floor and Kramer came into the room to help hold defendant down while Angerame and Albarran finished handcuffing her. Kramer entered the room after defendant kicked Angerame.

¶ 44                        B. Ineffective Assistance

¶ 45    "In determining whether a defendant was denied the effective assistance of counsel, we apply the familiar two-prong test of *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504 (1984)." *People v. Falco*, 2014 IL App (1st) 111797, ¶ 14. "To prevail on a claim of ineffective assistance of counsel, a defendant must show [(1)] that counsel's performance was deficient and [(2)] that the deficient performance prejudiced the defendant such that [s]he was deprived of a fair trial." *Id.* In proving deficient

performance, " '[t]he defendant 'must overcome the strong presumption that counsel's action or inaction was the result of sound trial strategy.' " *People v. Bustos*, 2020 IL App (2d) 170497, ¶ 86 (quoting *People v. Perry*, 224 Ill. 2d 312, 341-42 (2007)). "To establish prejudice, the defendant must show a reasonable probability that, absent counsel's alleged error, the trial's outcome would have been different." *Falco*, 2014 IL App (1st) 111797, ¶ 14. " 'A reasonable probability of a different result is not merely a possibility of a different result.' " *Id.* (quoting *People v. Evans*, 209 Ill. 2d 194, 220 (2004)). "If the defendant fails to establish either prong, his ineffective assistance claim must fail." *Id.* We review *de novo* whether defendant's trial counsel was ineffective. *Id.*

¶ 46    Defendant argues that trial counsel was ineffective because (1) she failed to object when the State asked defendant a series of questions about defendant wetting her pants; (2) failed to object when the State used those questions and answers in closing argument to convince the jury that defendant was lying; and (3) failed to introduce at trial the dashboard video, in which one deputy mentions that defendant "pissed" herself and the other deputy replies, "Yeah." We disagree.

¶ 47    First, the hearsay bar would have precluded defense counsel from introducing the deputy's statement to establish that defendant wet her pants. Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." See Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). Even if defense counsel learned through an investigation which deputies were involved in the discussion and subpoenaed them to testify at trial, any testimony they gave about defendant wetting her pants would be of no pertinence to the ultimate issue of whether defendant acted knowingly. According to defendant, she wet her pants while she was positioned on her stomach, flat on the ground, and the deputies

jumped on her back. All of that transpired *after* defendant, while positioned on her hands and knees, kicked Angerame's knee.

¶ 48    Second, even aside from the hearsay factor, there were admissibility issues with the dashboard video. Defendant is heard on the dashboard video questioning the deputies' decision not to target more serious crimes and accusing them of harassing her and abusing her daughter. The defense, however, had agreed before trial not to introduce evidence of defendant's negative opinions of Kendall County officials.

¶ 49    Third, assuming defendant could overcome the hearsay bar and excise the portions excluded by the pretrial agreement, counsel may have made a strategic decision not to pursue the matter. Defendant is screaming or mumbling in the background throughout most, if not all, of the recording. Counsel may have decided that the benefit from presenting the backseat video to establish that defendant wet her pants did not outweigh potential questions in the jury's mind about defendant's state of mind, at best, and sanity, at worse. *People v. Stanley*, 44 Ill. App. 3d 85, 88 (1976) (while the negative results of laboratory testing suggested that cleaning fluid spilled at the scene of the burglary was not found on the defendant's pants and, thus, the results would have counteracted the impact of police testimony concerning the similarity of smell between the fluid spilled at the scene and the smell of the defendant's pants, trial counsel's decision not to stipulate to the results of the lab report or attempt to secure the report's admission was not ineffective assistance, as the report also included damaging evidence about blood found at the scene that would have implicated the defendant given that he had a bleeding wound on his ankle).

¶ 50    Finally, and perhaps most importantly, we cannot conclude that the State truly impeached defendant with its questions about whether defendant wet her pants. The backseat video shows defendant kicking the passenger door, and there clearly is a wet spot on the inside left thigh of her

light-colored blue jeans. Given this evidence and the trial court's admonishment to the jury that it should disregard any arguments from either party that were not based on the evidence, we cannot conclude that defendant was prejudiced by counsel's failure to offer the portion of the dashboard video where two deputies note that defendant "pissed" her pants. *People v. Landerman*, 2018 IL App (3d) 150684, ¶ 47 (although the State in closing argument falsely attributed certain remarks to the defendant, defense counsel was not ineffective for failing to object to the State's comment because the trial court instructed the jury to disregard any argument made by either party in closing that was not based on the evidence presented).

¶ 51    Defendant argues that "[i]f the jury believed—as the prosecutor argued—that [defendant] was untruthful about wetting her pants, then it follows the jury would not believe the rest of her testimony" about not knowingly kicking Angerame. We disagree. It is well settled that a trier of fact may accept a portion of a witness's testimony without accepting all of it. *People v. Borges*, 127 Ill. App.3d 597, 605 (1984) (the trier of fact judges the credibility of the witnesses and may believe part of a witness's testimony without believing it all). Thus, even if we accepted that the State impeached defendant's testimony that she wet her pants and that counsel was deficient for failing to rebut that impeachment, we would not accept that counsel's omission was prejudicial. What the jury believed on the ancillary issue of whether defendant wet her pants simply has no bearing on what they believed concerning the material issue of whether defendant knowingly kicked Angerame.

¶ 52                                III. CONCLUSION

¶ 53    For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 54    Affirmed.