2024 IL App (2d) 230259
No. 2-23-0259
Opinion filed September 3, 2024

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 21-CF-1940 |
| J.F., | ) ) ) | Honorable Elizabeth K. Flood, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court, with opinion.
Presiding Justice McLaren and Justice Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, J.F., appeals the judgment of the circuit court of Kane County finding him not

not guilty of domestic battery by knowingly making physical contact of an insulting or provoking

nature with the victim, G.F. (720 ILCS 5/12-3.2(a)(2) (West 2020)). On appeal, defendant

contends that the trial court erred by failing to hold a discharge hearing within the statutory 60-

day term and abused its discretion in refusing to take judicial notice of the substantive contents of

the fitness evaluation and the status update reports in the record. Defendant also challenges the

sufficiency of the evidence, contending that the evidence did not prove beyond a reasonable doubt

that he knowingly made insulting or provoking physical contact with the victim. Last, defendant

contends that the trial court was required under the statute to close the court file after the discharge

hearing. We affirm.

¶ 2                                    I. BACKGROUND

¶ 3      We summarize the relevant facts appearing in the record. On November 4, 2021, defendant was arrested and charged by complaint with offenses occurring between January 1, 2021, and October 20, 2021. Specifically, defendant was charged with aggravated criminal sexual abuse (*id.* § 11-1.60(b), (d)) (counts I and II) and domestic battery (*id.* § 12-3.2(a)(2)) (counts III to V). In counts I, II, and V, defendant was charged with touching the breasts of his sister, G.F. In counts III and IV, he was charged with rubbing G.F.'s feet (insulting contact battery). On November 4, 2021, defendant was arraigned and a $20,000 bond was set.

¶ 4      On November 18, 2021, defendant appeared before the trial court, seeking a bond reduction. Defendant's attorney, the public defender, requested a fitness evaluation. The court determined that there was a *bona fide* doubt as to defendant's fitness and ordered the Kane County Diagnostic Center (Center) to perform defendant's fitness evaluation. Between this hearing and his fitness evaluation, on December 2, 2021, the State indicted defendant with the same charges and the same numbering of the counts as in the original complaint. Over the course of two appointments, on December 22, 2021, and February 14, 2022, defendant was evaluated by Dr. Michael Oliverio, a staff psychologist at the Center.

¶ 5      Following his appointments with defendant, Oliverio completed a written fitness evaluation based on a review of relevant educational and psychiatric records pertaining to defendant, an extensive interview with him, and Oliverio's clinical observations of him during the interview. Oliverio opined that defendant's untreated mental condition would impair his ability to think clearly and his ability to assist in his defense. However, when defendant adhered to his medication regime, Oliverio noticed an improvement in his psychiatric stability but no improvement in his deficits regarding understanding basic factual legal information and concepts. Oliverio further opined that defendant's deficits would preclude him from effectively participating

in his defense. Oliverio believed, however, that participation in formal fitness restoration would help defendant to develop a sufficient understanding of the legal processes to apply to his case and participate in his defense.

¶ 6    Oliverio diagnosed defendant with schizophrenia, a learning disorder with impairment in reading, and an unspecified communication disorder, and he provisionally diagnosed defendant with cannabis use disorder. Regarding defendant's fitness to stand trial, Oliverio concluded:

> "During this evaluation, [defendant] demonstrated an inability to understand the nature and purpose of the proceedings against him and assist in his defense. Based on the findings of the current evaluation, and to a reasonable degree of psychological certainty, I believe that [defendant] *does not* meet the legal criteria for fitness to stand trial at this time. [Defendant] could likely be restored to fitness within one year and the least restrictive setting for restoration treatment would be on an outpatient basis. Notably, with the assistance of coordinating appointments with his family, [defendant] attended both sessions for this evaluation in the community. Furthermore, he reported that he was compliant with psychotropic medications during the second appointment [*sic*] and he appeared psychiatrically stable." (Emphasis in original.)

¶ 7    On February 24, 2022, the trial court held a stipulated fitness hearing. The court determined that defendant was unfit and that there was a substantial probability that, with treatment, he could be restored to fitness within one year. The court ordered defendant to participate in outpatient fitness restoration.

¶ 8    On March 30, 2022, the trial court determined that defendant had failed to be compliant with his outpatient treatment. On April 30, 2022, the defense and the State acknowledged receipt of defendant's treatment plan, and the matter was continued for further status.

¶ 9      On July 8, 2022, Kathryn Haeffner, a therapist with the Ecker Center for Behavioral Health (Ecker Center), submitted a report about defendant's progress in outpatient restoration services. Haeffner opined that defendant remained unfit to stand trial and that there was a moderate degree of probability that defendant would attain fitness within the statutory time frame of one year from the original finding of unfitness, with the recommendation that he continue to receive outpatient restoration services. On July 12, 2022, the trial court sealed the fitness report and continued the matter for further status.

¶ 10      On September 21, 2022, Elissa Williams, a therapist with the Ecker Center, submitted a follow-up fitness report. She noted that defendant was compliant with treatment, but she opined that he remained unfit to stand trial; there was a moderate degree of probability that defendant would attain fitness to stand trial within the statutory time frame, and she recommended continued restoration services. On October 19, 2022, the trial court held a status hearing, accepted and sealed the September fitness report, and continued the matter for further status.

¶ 11      On January 18, 2023, the trial court held a status hearing. Defendant requested a discharge hearing, and the court continued the case, scheduling a discharge hearing for March 8, 2023.

¶ 12      On January 30, 2023, Williams submitted a follow-up fitness report. She opined that defendant was unfit to stand trial and was not likely to become fit within the statutory time frame because, despite some small measure of progress, he was unable to understand and retain information about legal proceedings.

¶ 13      On January 31, 2023, the State filed a motion to continue the discharge hearing. On February 8, 2023, the matter advanced to hearing, and the State informed the court of the prosecutor's unavailability for the March 8 hearing. The parties stipulated to the contents of the January 30 report, and the defense agreed to reschedule the discharge hearing, noting that the

hearing must be held within 120 days of the request. The court struck the hearing date and informed the parties it wished to review the January 30 report before setting a new discharge hearing date.

¶ 14     On February 10, 2023, the parties again stipulated to the contents of the January 30 report. The trial court determined that defendant was unfit to stand trial and unlikely to become fit within the statutory time frame. The court scheduled the discharge hearing for April 19, 2023. On April 10, 2023, the trial court struck the April 19 hearing date by agreement of the parties. The discharge hearing was rescheduled for May 24, 2023.

¶ 15     On May 24, 2023, the defense requested a continuance, explaining that the parties were negotiating to resolve the case without holding a discharge hearing. Defense counsel represented that one of the issues under negotiation was the possibility that defendant would be required to register as a sex offender should the matter proceed to a discharge hearing and defendant be found not not guilty. The trial court continued the matter, finding good cause existed.

¶ 16     On June 21, 2023, the matter advanced to the discharge hearing. The State nol-prossed counts I and II (aggravated criminal sexual abuse). Defendant's mother, Josefina G., testified that she lived with defendant, her daughter, G.F., and their father, Javier F. Defendant was born in November 2002, and G.F. was born in 2008. In their home, there were two bedrooms, one for the women and one for the men. Josefina testified that, on October 20, 2021, she called police to her home. G.F. spoke with the police and then was taken to the Kane County Child Advocacy Center. Due to defendant's arrest, Josefina made sure that her and Javier's work schedules were arranged so that someone was always home with the children.

¶ 17     G.F. testified about two incidents that occurred between January 2021 and October 2021. Defendant entered her room on two occasions when their parents were not home. On the first occasion, defendant touched G.F.'s feet over her socks, and this made her uncomfortable. Defendant's hands stayed still. G.F. told defendant to stop, and defendant complied and left her

room. On the second occasion, G.F. was asleep when defendant entered her room. G.F woke up when defendant began rubbing her breasts over her shirt. When she woke up, defendant told G.F. that he came into her room to pull up her blanket because he thought she was cold. G.F. testified that, in fact, she was not cold. Defendant's actions made G.F. uncomfortable and she ordered him to leave her room. Defendant complied.

¶ 18    David Smith, an investigator with the state's attorney's office, testified that he spoke to defendant. Defendant told Smith that he slept in the living room and that G.F. and Josefina slept in a separate bedroom. Defendant told Smith that he entered G.F.'s room while she was sleeping and after Josefina had left for work. Smith testified that he believed that defendant appeared to understand the questions being asked and answered them appropriately. Defendant interrupted the questions occasionally, and Smith had to tell defendant to stop and listen. Smith also had to redirect defendant "a couple of times" when defendant strayed off topic.

¶ 19    The State rested its case in chief following Smith's testimony. Defendant moved for a directed finding, and the trial court granted the motion regarding the counts related to the touching of G.F.'s feet (counts III and IV). The court denied the motion regarding count V, which alleged defendant touched G.F.'s breasts.

¶ 20    Ultan Gallagher, an officer with the Elgin Police Department, testified that, during the evening of October 20, 2021, he was dispatched to defendant's home. There, he spoke with defendant for about a half-hour. Gallagher testified that defendant appeared to be erratic and spoke as if he were under the impression that people were out to get him. Based on his observations during their conversation, Gallagher called for the police department's crisis counselor, a social worker, to determine whether defendant had any mental health issues. Gallagher arrested defendant and, in consultation with the crisis counselor, took defendant to the hospital for a mental

health evaluation. The crisis counselor informed Gallagher that defendant would be admitted, and Gallager left defendant in the care of the hospital.

¶ 21    After Gallagher's testimony, the defense asked the trial court to take judicial notice of Oliverio's fitness evaluation, the follow-up fitness reports, and the "history of this file." The State objected, noting that, while the court could take judicial notice of anything contained in the court file, the fitness evaluation and follow-up reports were not relevant because they were conducted well after the fact of the offenses. The defense responded that the conditions described in the evaluation and reports were ongoing problems "that would have been present at the time of this alleged offense" and they would have a bearing on whether defendant could form the necessary *mens rea* to commit the offense of battery.

¶ 22    The trial court sustained the State's objection. The court reasoned that the reports were written to inform it if defendant were fit to stand trial at the time the reports were generated, not of his mental state at the time of the offense. The court further stated that, generally,

> "I would take judicial notice of anything within the court file, but I can't pretend for a moment that me reading evaluations without anyone here testifying that the behavior or conduct or symptoms observed at the times of the reports existed at the date of the offense, [so] it is not relevant at this time."

¶ 23    Following the parties' arguments, the trial court found defendant not not guilty of domestic battery against G.F. The court first determined that the only contested issue was whether defendant knowingly made contact of an insulting or provoking nature; the other elements, contact and family member, were not challenged. The court reasoned:

> "Although, I granted the motion for directed finding as to the first two counts [*sic*], I do find that that information is relevant and would have been admissible as other acts had that occurred before.

I am considering the fact that this is not the first time the defendant entered the victim's room while she was sleeping. It was the second time. The first time he had come in and touched her feet and then left.

I will also note that, given the dates of birth that were testified to by both parties' mother, that it appears that at the time of this incident, [G.F.] was approximately 12 or 13 years old. The defendant, I believe, was 20 years old.

The defendant came into her bedroom a second time while she was sleeping. And she says that he touched her breast over her shirt; that his hand was moving; she was uncomfortable. She was crying and clearly visibly upset while testifying to this incident and stated it made her uncomfortable.

The stated reason from [defendant] was that [G.F.] was cold. However, again, I'm referring back to her age at the time. This was not a 3-year-old, it was not a 6-year-old, or an infant where someone might wander into someone's room, check to see if they're cold and cover them. No one at age 12 or 13 needs someone to come into their room and check to see if they're cold, and I would state not their 20-year-old brother.

So at this time, given all of the information presented, I do find that the defendant knowingly made contact of an insulting/provoking nature with [G.F.]

I do find the State has proven each and every element beyond a reasonable doubt.

Therefore, the defendant is not not guilty of that charge."

¶ 24 The trial court then turned to the issue of what to do with defendant. The court noted that, statutorily, defendant could be remanded for more treatment only for one year for the offense with which he was charged. The parties agreed that defendant already received the maximum allowable amount of court-ordered treatment, and the court requested input regarding the form of the final order. The State suggested that the order be limited to the finding of not not guilty because the

three-year limitations period on the underlying offense had not yet lapsed. The defense suggested that, because the State was not seeking to civilly commit defendant and there were no sexual offender reporting requirements associated with the offense, the court should include in the order that it was closing the case file. The court's June 21, 2023, order stated that a discharge hearing was held, the court entered a directed finding on counts III and IV (insulting or provoking touching of the victim's feet) and entered a finding of not not guilty on count V (insulting or provoking touching of the victim's breasts). The court did not include an order closing the case file, but it also did not schedule any dates for hearings in the future.

¶ 25 On June 26, 2023, defendant filed a motion for a new discharge hearing. Defendant challenged the sufficiency of the State's evidence to support the not not guilty finding because the State failed to prove beyond a reasonable doubt that defendant's contact with the G.F. was not accidental. Defendant also argued that the trial court erred in not taking judicial notice of the fitness evaluation and the status reports and relating them to whether his conduct was "knowing." Defendant also argued that the court erred in not closing the case file. The court denied the motion.

¶ 26 Defendant timely appeals.

¶ 27 II. ANALYSIS

¶ 28 On appeal, defendant challenges both the timing of the discharge hearing and the trial court's decisions at that hearing. First, defendant argues that the court erred in not holding a discharge hearing within 60 days of its determination that defendant could not be restored to fitness within one year. Second, defendant argues that the court abused its discretion in refusing to take judicial notice of the fitness evaluation and the status update reports for the purpose of determining whether, at the time of the offenses, defendant could form the requisite intent to commit domestic battery. Third, defendant challenges the sufficiency of the evidence supporting the court's not not

guilty finding. Last, defendant argues that the court erred in not entering an express order closing its case file following the not not guilty finding.

¶ 29    Preliminarily, on June 3, 2024, two days before the scheduled oral argument, the State filed a motion for leave to cite *People v. Edwards*, 2024 IL App (2d) 240155-U, as additional authority. Defendant objects, arguing that the timing of the request, just before oral argument, in practice artificially deprives defendant of his allotted time to file an objection. Defendant further complains that the State exhibits a pattern of filing motions to cite additional authority a few days before oral argument and, for this reason, asks that we deny the motion.

¶ 30    In its motion, the State does not discuss *Edwards*'s relevance to the issues in this case or the purposes for which it sought to cite *Edwards*. *Edwards* provides a general discussion about the defendant agreeing to delay in holding a pretrial detention hearing and the general applicability of waiver to timeliness concerns. *Id.* ¶¶ 26-29. It also includes two sentences regarding invited error. *Id.* ¶ 30. The State, however, does not attempt to explain even superficially what issues *Edwards* resolved and how it might inform our analysis. Because the State provides no compelling reasons to consider *Edwards*, we deny the State's motion. We now turn to defendant's contentions.

¶ 31                       A. Timeliness of Discharge Hearing and Remedy

¶ 32    Defendant argues that the trial court failed to hold a timely discharge hearing following its finding that there was no substantial probability that defendant could be restored to fitness within one year. While conceding that the statute does not provide a remedy for an untimely hearing, defendant urges that we reverse the court's finding of not not guilty and enter an acquittal.

¶ 33    We begin by considering the requirements of article 104 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/art. 104 (West 2022)). A defendant is presumed to be fit to stand trial, to plead, and to be sentenced. *Id.* § 104-10. The standard of fitness is whether the defendant is able to understand the nature and purpose of the proceedings against him or her or to assist in his or her

defense. *Id.* Within 45 days of a written fitness report, a defendant is entitled to a fitness hearing, which is limited to the issue of whether the defendant can understand the proceedings, can assist counsel with the defense, and can accurately perceive and recall. *Id.* § 104-16. An unfit defendant shall be placed in the least restrictive setting for restorative therapy. *Id.* § 104-17. As an adjunct to the therapy, the defendant's treater must offer an opinion on the probability of restoring the defendant to fitness within the allotted time frame (in the instant case, within one year). *Id.* The treater shall submit periodic progress reports, and the trial court shall hold periodic hearings to determine whether the defendant is making progress toward restoration of fitness. *Id.* §§ 104-18, 104-20.

¶ 34    "Upon a determination that there is not a substantial probability that the defendant will attain fitness within the [required time period] from the original finding of unfitness, the [trial] court *shall hold* a discharge hearing within 60 days, unless good cause is shown for the delay." (Emphasis added.) *Id.* § 104-23(a).[1] The discharge hearing proceeds in accordance with section

---

[1]This section was amended by Public Act 102-1118, § 45 (eff. Jan. 18, 2023). Before the amendment, subsection (a) provided: "Upon a determination that there is not a substantial probability that the defendant will attain fitness within the [required time period] from the original finding of unfitness, a defendant or the attorney for the defendant may move for a discharge hearing pursuant to the provisions of Section 104-25. The discharge hearing shall be held within 120 days of the filing of a motion for a discharge hearing, unless the delay is occasioned by the defendant." 725 ILCS 5/104-23(a) (West 2020). For clarity and as needed, we will refer to the version amended by Public Act 102-1118 as the 2023 amended version and we will refer to the version effective before January 18, 2023, as the previous version.

104-25 (*id.* § 104-25),[2] and it is not a criminal prosecution but an "innocence only" proceeding that assesses whether the evidence proves the defendant's guilt beyond a reasonable doubt. *People v. Waid*, 221 Ill. 2d 464, 469-70 (2006). It is " 'a proceeding to determine only whether to enter a judgment of acquittal, not to make a determination of guilt.' " *Id.* at 470 (quoting *People v. Rink*, 97 Ill. 2d 533, 543 (1983)). If the evidence fails to prove the defendant's guilt beyond a reasonable doubt, the defendant is acquitted of that charge; if the evidence is sufficient to prove the defendant guilty beyond a reasonable doubt, no conviction enters; rather, the defendant is found not not guilty and may be held for restorative treatment with no prosecution occurring unless and until the defendant is found fit to stand trial. *Id.* Moreover, a discharge hearing is deemed a civil proceeding that is implemented, along with the other portions of the statute we have discussed, to prevent the due process violation that would result should an unfit defendant be criminally prosecuted. *Id.*

¶ 35    We now come to the crux of defendant's contention: section 104-23(a). The differences between the 2023 amended version of section 104-23(a) and the previous version are how the discharge hearing is initiated, the time frame in which a discharge hearing must be held, and the standard that must be demonstrated for allowable delays. In the previous version, the discharge hearing was initiated by a defendant's motion. 725 ILCS 5/104-23(a) (West 2020). The 2023 amended version states, "the court shall hold a discharge hearing," with no mention as to how that discharge hearing will be initiated. 725 ILCS 5/104-23(a) (West 2022). Next, the time frame within which a discharge shall be held changed from 120 days in the previous version (725 ILCS 5/104-23(a) (West 2020)) to 60 days in the 2023 amended version (725 ILCS 5/104-23(a) (West 2022)). Finally, in the previous version, the 120-day time limit was subject to delay "occasioned by the

_____

[2]We need not dwell on this section's requisites at this time because defendant does not challenge the conduct of the discharge hearing itself.

defendant." 725 ILCS 5/104-23(a) (West 2020). In the 2023 amended version, the 60-day time limit brooks no delay "unless good cause is shown." 725 ILCS 5/104-23(a) (West 2022).

¶ 36    The trial court did not hold a discharge hearing within 60 days of the determination that there was not a substantial probability that defendant would attain fitness within the one-year statutory time frame. First, on February 10, 2023, the court made its finding that defendant could not be restored to fitness within one year. We note that this finding was entered after the amendment to section 104-23(a) had taken effect. Accordingly, the court was required to hold the hearing within 60 days of its February 10 determination, or on or before April 11, 2023. On June 21, 2023, the court held the discharge hearing, 131 days after the determination that defendant could not be restored to fitness.

¶ 37    The record shows that a number of hearings occurred between February 10, 2023, and June 21, 2023. The record shows that only in the order from the May 24, 2023, hearing did the trial court expressly pronounce that it found good cause to postpone a discharge hearing. The hearings after May 24 appear to have been held to schedule the June 21 discharge hearing, and on June 21 the discharge hearing was held.

¶ 38    Defendant argues that the trial court did not follow the procedures set forth in the 2023 amended version of section 104-23(a) and proposes that, to make these procedures more than a nullity, the court's finding of not not guilty should be reversed and an outright acquittal should be entered. Specifically, defendant argues that the statutory framework's failure to provide a remedy for failing to hold a discharge hearing within the statutory time limit "is clearly a legislative oversight" because, without a remedy, the time limit for holding a discharge hearing is rendered "toothless and unenforceable in practice." We disagree with defendant's reasoning and address each of his arguments.

¶ 39    First, defendant, characterizing an untimely discharge hearing as a due process violation, contends that the failure to include a remedy for a violation of section 104-23(g)'s time limit constitutes a simple legislative oversight because the legislature must have intended there be specific and severe consequences. We have examined the various versions of section 104-23(a) as well as the entirety of article 104. Nowhere does article 104 specify a consequence for an untimely discharge hearing (or, in point of fact, for any violation of article 104's provisions). This lack of consequences for an untimely discharge hearing or any other violation holds true for the earlier versions of article 104.

¶ 40    It is axiomatic that, when the legislature amends a statute, the amendment is presumed to have a purpose, and the amended language will not be construed the same way as the unamended language, so as to give effect to that amended language. *People v. Jasoni*, 2012 IL App (2d) 110217, ¶ 17. In 1979, section 104-23 was added to article 104. Pub. Act 81-1217, § 1 (eff. Dec. 28, 1979). Since its addition, section 104-23, and article 104 itself, has been amended many times. In neither the original version nor any of the amendments has there been an express consequence included. We reject defendant's "legislative oversight" premise.

¶ 41    The lack of an express remedy means we should not and cannot, under the guise of interpreting the provision, change it by supplying purported omissions, remedying perceived defects, annexing new provisions, substituting different provisions, and otherwise adding exceptions, limitations, or conditions not expressed by the legislature or supported by the plain meaning of the statutory language. *People v. Grant*, 2022 IL 126824, ¶ 25. Our supreme court further cautioned that we may not, hiding behind the fig leaf of construction, "correct" a claimed error or oversight by the legislature. *Id.*

¶ 42    In *Grant*, our supreme court explained that a statutory command is mandatory if it provides a particular consequence for noncompliance, and it is directory if no particular consequence for

noncompliance is specified. *Id.* ¶ 30. The statute at issue in *Grant* required law enforcement agencies to preserve forensic evidence and, elsewhere, specified felony liability for intentional noncompliance. *Id.* ¶ 31. The court concluded that the statute was mandatory and rejected the defendant's contention that the consequence should have been invalidation of his conviction. *Id.* ¶¶ 31-32. The court reasoned that the plain language of the statutory provisions prescribed the remedy of felony liability for intentional noncompliance with the command to preserve forensic evidence, not invalidation of the conviction, and added that, had the legislature intended that the defendant's conviction be invalidated, it would have expressly provided for that. *Id.* ¶ 35.

¶ 43 This reinforces our conclusion that the legislature did not overlook providing a consequence for not providing a discharge hearing within 60 days. Nothing in article 104 suggests there is a consequence for an untimely discharge hearing, and neither our nor the parties' research indicates that article 104 or any other statute provides a consequence. Because the legislature did not see fit to impose the consequence defendant seeks here, the vacation of the trial court's not not guilty finding, we cannot add it into section 104-23(a) (or article 104) under the guise of "correcting" a legislative oversight. *Id.* ¶ 25.

¶ 44 Next, defendant argues that an untimely discharge hearing constitutes a due process violation in the same fashion as the prosecution of an unfit defendant. This argument fails from the outset. The purpose of article 104 is to *prevent* the prosecution of an unfit defendant by setting forth the process that is due and that must be followed. 725 ILCS 5/art. 104 (West 2022). Moreover, a discharge hearing is not a criminal prosecution, but a civil proceeding. *Waid*, 221 Ill. 2d at 472. Criminal constitutional due process concerns are not implicated in this case.

¶ 45 Defendant's argument places the civil-in-nature discharge hearing and its attendant procedures on the same footing as the *actual* due process violation of prosecuting an unfit defendant. To accept this argument would require us to treat the discharge hearing as a criminal

proceeding that necessarily must be cloaked in all the safeguards afforded criminal defendants in criminal proceedings. Longstanding authority, however, contradicts this argument. *E.g.*, *id.*

¶ 46 Defendant argues that the "due process violation" of an untimely discharge hearing requires a remedy because "[i]t would be absurd for a violation of a constitutional right to not have a remedy." As noted, defendant's premise is faulty. Specifically, to invoke a remedy for the violation of a constitutional right, there must first be a violation of a constitutional right. Here, the issue of the discharge hearing involves only a statutory, not a constitutional, issue and, fundamentally, is not of constitutional dimension, being a civil, not criminal, proceeding. This is not to say that defendant is not entitled to whatever process is due, but it is to say that there has been no constitutional violation requiring a remedy. Defendant's insistence in this case that a constitutional violation requires a remedy is a straw man constructed out of the chaff of false equivalencies. Finally, defendant suggests that outright reversal is necessary to remedy the purported due process violation. Obviously, however, without a due process violation, there is no need to remedy what has not been injured. Accordingly, we reject defendant's argument.

¶ 47 Notwithstanding defendant's argument, the trial court clearly did not hold a discharge hearing within 60 days of the February 10, 2023, determination that defendant could not be restored to fitness. For purposes of this analysis, we assume that this constitutes error on the court's part. The question then becomes, was the error reversible? We first note that defendant does not contend that the failure to hold the discharge hearing within the 60-day period prejudiced defendant, and we can discern no prejudice in our review of the record. Defendant was not confined during the restoration services, instead attending those services on an outpatient basis. The record further suggests that defendant was uncomfortable living in a hotel and was returned to his home. Once there, both parents adjusted their schedules to ensure that defendant was never alone with G.F. and, significantly, G.F. had indicated that she was willing to live with defendant under those

circumstances. We conclude that the record is devoid of any indication of prejudice to defendant arising from the delay in holding the discharge hearing.

¶ 48    Next, we note that, on February 8, 2023, defense counsel represented, incorrectly, that the discharge hearing had to be held within 120 days of the request for such hearing. On February 10, 2023, the trial court made the finding that defendant could not be restored to fitness within the statutory time limit. Apparently still laboring under the misapprehension that a 120-day limit applied to holding the discharge hearing, and after confirming the prosecutor's unavailability, the court suggested the discharge hearing be held on April 12, 2023. This date, we note, was outside of the correct, 60-day limit under the 2023 amended version of section 104-23, which leads us to the inference that the parties continued in their mistaken belief as to the deadline for holding a discharge hearing (and, because the setting came just two days after defense counsel made the erroneous representation to the court, it remains a reasonable inference). Defense counsel refused the April 12, 2023, date on grounds that she was unavailable. Eventually and by agreement, the parties continued the hearings to May 24, 2023. In the interim, the court also ordered defendant to undergo drug testing in April and May (before the discharge hearing). On May 24, 2023, the parties postponed the discharge hearing once again, representing that they were negotiating for a resolution short of a discharge hearing. In its May 24 order, the court expressly found this to constitute good cause for any delay. The matter was continued to June 8, 2023, for the parties to report the status of their negotiations and for setting a date for the discharge hearing. On June 8, 2023, pursuant to the previous order, the parties reported to the court that their negotiations had not succeeded, and the court set a June 21, 2023, date for the discharge hearing.

¶ 49    We thus see that, in a significant sense, defense counsel injected error into timeline for the discharge hearing, of which he is now complaining on appeal. First, defendant erroneously informed the trial court that the discharge hearing needed to be completed within 120 days rather

than the correct time period of 60 days.[3] Next, when the court suggested holding a discharge hearing on April 12, 2023, or the sixty-first day following the determination that defendant could not be restored to fitness, defense counsel expressly refused that date and the parties agreed to an even later date. We do not attribute the delay in holding the discharge hearing solely to defense counsel, as the trial court and the State should have recognized that the 2023 amended version of section 104-23 applied. However, defense counsel supplied information that was flatly incorrect at the outset, and that incorrect information seems to have influenced the succeeding proceedings. In a very significant sense, defense counsel invited the error of which defendant complains on appeal, and this provides ample reason to reject defendant's argument. See *People v. Boyd*, 2023 IL App (2d) 220053, ¶ 19 (the invited-error doctrine disallows a defendant from appealing based on an error he or she injected into the trial court proceedings, because of the manifest unfairness and the promotion of improper gamesmanship should the appellate court countenance such behavior).

¶ 50   The 2023 version of section 104-23 provides that a discharge hearing may be postponed where "good cause is shown for the delay." Initially, it is well settled that the trial court's judgment may be sustained on appeal on any ground supported in the record. *People v. Lezine*, 2023 IL App (2d) 220065, ¶ 17. The initial delay was due to the prosecutor's unavailability and the date of April 19, 2023, was chosen by agreement despite it being outside of the 60-day window. We hold that this constituted good cause because first, the prosecutor was unavailable, and second, the court had been erroneously informed by defense counsel as to the time frame in which the discharge hearing was required to be held, and third, the parties agreed to the setting. Next, the April 19 date

_____

[3]This does not excuse the trial court's mistake in not proceeding under the proper timeline, but it also makes clear defense counsel's contribution to the untimeliness of the discharge hearing.

was stricken by agreement of the parties, and a new date of May 24, 2023, was chosen. The court also ordered defendant to undergo drug testing in April and in May. On May 24, 2023, the parties reported that they were negotiating, attempting to find a resolution short of the discharge hearing. The record supports an inference that negotiations were ongoing throughout the period, and these negotiations would also constitute good cause for delaying the discharge hearing. This conclusion is bolstered by the fact that the State nol-prossed the felony charges of aggravated criminal sexual abuse before the discharge hearing because a finding of not not guilty would have subjected defendant to a lifetime of sexual-offender registration. In addition, the drug testing in conjunction with the negotiations provided good cause for the delay. Likewise, at the May 24, 2023, hearing, the court expressly entered a finding that there was good cause for the delay, and we determine that this finding would necessarily apply to the period from the stricken April 19 hearing to the May 24 hearing, to the period before the June 8 status hearing to allow the negotiations to conclude, as well as to period before the setting of the actual discharge hearing date. Thus, we conclude that the record consistently demonstrates that good cause was shown for the delays of the discharge hearing. As the record demonstrates valid reasons—and thus good cause—for the delays, even though the discharge hearing was held 131 days after the finding that defendant could not be restored to fitness, there is no violation of section 104-23.

¶ 51    Finally, *People v. Lavold*, 262 Ill. App. 3d 984 (1994), which neither party cited, is instructive. In that case, the appellate court was dealing with the failure of the trial court to timely hold a hearing after the defendant had been subjected to extended treatment pursuant to section 104-25(g) (725 ILCS 5/104-25(g) (West 1992)). *Lavold*, 262 Ill. App. 3d at 990-92. The defendant contended that he did not receive a hearing for over two years following the expiration of his extended treatment term. As a result of this tardiness, defendant contended that he should have been released from treatment. *Id.* at 991. The appellate court disagreed. According to the appellate

court, section 104-25(g) did not require that the hearing be conducted simultaneously with the expiration of the extended treatment period. Instead, the court held that the tardy hearing was proper because the court did "not believe that the legislature contemplated that where there is a delay in providing the appropriate hearing, no hearing will be held and the defendant will simply be released." *Id.* The court condemned the two-year delay, but it also determined that, despite the delay, the hearing was properly conducted, holding that the hearing, "although untimely, was valid and [the defendant] was not entitled to be released [because of the untimeliness]." *Id.* at 991-92. We find the court's reasoning persuasive here. There is nothing in section 104-23 that supports the idea that the defendant is entitled to be released with no showing of impropriety beyond the untimeliness of the hearing. Moreover, we discern no prejudice accruing to defendant due to the untimeliness of the hearing, and defendant does not contend that he experienced any prejudice. Accordingly, we find *Lavold* to be persuasive and follow its reasoning, thereby rejecting defendant's contention that untimeliness, standing alone, requires automatic release.

¶ 52    Defendant suggests that analogy to the speedy trial statute (725 ILCS 5/103-5 (West 2022)) may prove useful. We reject the analogy as unsound because the speedy trial statute implements a constitutional right (*People v. Hartfield*, 2022 IL 126729, ¶ 32) and article 104 implements a civil statutory right and implementing a similar remedy for an untimely discharge hearing would only read into article 104 a provision neither included by the legislature (*Grant*, 2022 IL 126824, ¶ 25) nor required by the gravity of the violation.

¶ 53    Accordingly, for the foregoing reasons, we reject defendant's contention that he is entitled to reversal of the trial court's finding of not not guilty due to any untimeliness in holding his discharge hearing.

¶ 54           B. Judicial Notice of Fitness Evaluation and Status Update Reports

¶ 55    Defendant argues next that the trial court abused its discretion in failing to take judicial notice of Oliverio's fitness evaluation and the status reports provided by the Ecker Center in considering whether defendant acted knowingly when he rubbed G.F.'s breasts. According to defendant, the reports demonstrate defendant's mental health issues and give rise to an inference that, at the times of the offenses, defendant was incapable of acting knowingly. We disagree with defendant's framing of the issue and his resulting analysis.

¶ 56    As an initial matter, "the standard of review concerning an evidentiary matter, including judicial notice, is abuse of discretion." *People v. Castillo*, 2022 IL 127894, ¶ 35. An abuse of discretion occurs when the court's ruling was arbitrary, fanciful, or unreasonable, or when no reasonable person would take the court's view. *People v. Avendano*, 2023 IL App (2d) 220176, ¶ 66.

¶ 57    Defendant challenges the trial court's decision refusing to take judicial notice of Oliverio's fitness evaluation along with the status reports of the treating therapists at the Ecker Center. Following the testimony of the final witness, defense counsel requested "the Court to take judicial notice of the history of this file, [Oliverio's] evaluation, and the DHS reports." The State objected, claiming the reports were not relevant because the DHS reports were created as much as two years after the incidents, while Oliverio's evaluation consisted of two appointments occurring two and four months after the incidents. The State argued that the defense was contemplating either an insanity defense, a diminished capacity defense, or an argument that defendant could not form the requisite intent to act knowingly, and it reasoned that, because the evaluation and reports were remote in time from the incident, they were not relevant.

¶ 58    The defense argued that the evaluation and reports described persistent characteristics like learning disabilities and mental health problems. The defense represented that those persistent characteristics were ongoing issues that would have been present at the time of the incidents and

were relevant to the "court in determining whether a crime was knowingly committed." The trial court characterized its understanding that the defense was seeking the introduction and judicial notice of the evaluations and reports as supporting a guilty but mentally ill determination, which would not be an available result in a discharge hearing. The defense disagreed with the court's characterization and informed the court that it was seeking the admission and judicial notice of the evaluations and reports because they discussed defendant's mental health issues and learning disabilities, making them relevant to "whether he knew—he knowingly committed a crime or not," and the reports were "one factor for the Court to consider [in deciding] whether [defendant] knowingly committed the behavior [*sic*] and whether he knew that the behavior [*sic*] [was] insulting or provoking."

¶ 59     The trial court sustained the State's objection. The court explained:

"[A] finding that the defendant was not responsible for his conduct because of mental illness is a finding of insanity, and none of these documents contained in the [court file] because of the time in which any of the interviews or evaluations were conducted, first of all, that finding would not be relevant to this hearing and, second, they could not sufficiently inform the Court as to the defendant's mental state at the time the offense was—occurred or any alleged offense occurred.

The State's objection will be granted.

Generally, I would take judicial notice of anything within the court file, but I can't pretend for a moment that me reading evaluations without anyone here testifying that the behavior or conduct or symptoms observed at the times of the reports existed at the date of the offense, [so] it is not relevant at this time."

¶ 60     Defendant argues that Oliverio's evaluation and the status reports meet the relevancy criterion in the Illinois Rules of Evidence. See Ill. R. Evid. 401 (eff. Jan. 1, 2011) (relevant

evidence is evidence that has any tendency to make the existence of a fact more probable or less probable); Ill. R. Evid. 402 (eff. Jan. 1, 2011) (relevant evidence is admissible and irrelevant evidence is not admissible). Defendant argues that the issue in the discharge hearing was whether defendant was capable of acting "knowingly."[4] Defendant contends that the fitness evaluation and the status reports tend to show that it is less probable that defendant was capable of being consciously aware that his touching of G.F. was offensive or provoking, because the evaluation and the reports document longstanding mental health diagnoses and notes of learning disabilities while he was attending school.

¶ 61   We hold that the trial court did not abuse its discretion in refusing to take judicial notice of the fitness evaluation and the status reports. As an initial matter, while relevant evidence may generally be admissible, the court may still reject offered evidence as irrelevant if it is remote or uncertain. *People v. Harvey*, 211 Ill. 2d 368, 392 (2004). The court rejected defendant's invitation to take judicial notice precisely because the fitness evaluation and the status reports were both remote in time, and the defense's view that they spoke to his ability to form the requisite mental state of "knowingly" was, at best, tenuous and speculative. Thus, it properly rejected the evaluation and the reports on the ground of relevance. *Id.*

¶ 62   First, Oliverio's fitness evaluation was based on two interviews: the first interview was conducted about two months after the end of the time period when the incidents occurred and the

---

[4]The offense of domestic battery is defined as (1) knowingly, (2) without legal justification, (3) making physical contact by any means (4) of an insulting or provoking nature (5) with a family or household member. 720 ILCS 5/12-3.2(a)(2) (West 2020). To act "knowingly," a person must be "consciously aware" that his or her conduct is of the nature described in the statute defining the offense. *Id.* § 4-5(a).

second interview was conducted about two months after the first, or about four months after the time period. Thus, Oliverio's evaluation was remote in time and not contemporaneous with the incidents supporting the charges against defendant. The status reports, occurring approximately every three months after Oliverio's original fitness evaluation, are even more remote in time. Second and more importantly, however, neither the evaluation nor any of the reports commented on defendant's historical ability or inability to act "knowingly." The evaluation and the reports were tailored to discuss defendant's fitness to stand trial, and this is, in fact, what the data, analysis, and conclusions all dealt with. For example, Oliverio concluded that defendant "demonstrated an inability to understand *the nature and purpose of the proceedings against him and assist in his defense*." (Emphasis added.) Oliverio opined that defendant did not "meet the legal criteria for fitness to stand trial at this time." Thus, the focus and analysis of Oliverio's report was clearly on defendant's fitness to stand trial, and not on whether, historically, when the incidents occurred, defendant was consciously aware that he was engaging in insulting or provoking conduct by touching G.F. The same is true of the status reports. The reports were solely devoted to defendant's fitness to stand trial as of the date of the report and whether he could reasonably be restored to fitness within one year, not on whether defendant could form the requisite mental state of "knowingly" when the incidents occurred.

¶ 63    Second, we note that the trial court did not refuse to take judicial notice of the evaluation and the reports altogether; rather, the court refused to consider them for the purpose defendant wished, namely, to determine whether, when the incidents occurred, defendant could have acted "knowingly." The court stated that, while it would generally take judicial notice of the court file, it could not "pretend for a moment that [the court] reading evaluations without anyone here testifying that the behavior or conduct or symptoms observed at the times of the reports existed at the date of the offense, ***." We interpret this statement to mean that the evaluation and the reports

themselves spoke only to fitness and that, without further testimony relating the information in them to the issue of whether, when the incidents occurred, defendant could form the requisite mental state of "knowingly," the court would be engaging in speculation about defendant's historical ability to form the requisite mental state. Effectively, defendant was asking the court to supply its own diagnosis regarding defendant's mental abilities and whether he could act "knowingly" during the incidents. Because the court would have been required to speculate about the meaning of the records related to the issue of defendant's ability to act "knowingly," the records are uncertain for the purpose offered, and thus, they are irrelevant. *Id.*

¶ 64 Finally, we note that defendant's argument does not account for the longstanding principle that evidence admissible for one purpose may not be admissible for another. See Ill. R. Evid. 105 (eff. Jan. 1, 2011) ("When evidence which is admissible as to one party or for one purpose but not admissible as to another party or for another purpose is admitted, the court, upon request, shall restrict the evidence to its proper purpose or scope"). Here, the State properly challenged the relevance of the purpose for which defendant sought to admit the evaluation and the reports. The evaluation and the reports were certainly relevant to the issue of fitness, and the court clearly and properly relied upon them throughout the proceedings for that purpose. However, when defendant sought to broaden their scope and purpose to encompass his historical ability to act "knowingly," the court properly recognized that they were not admissible for that purpose, even as they were admissible for their original and proper purpose of determining whether defendant was fit to stand trial and whether he could be restored to fitness within one year. The court's sustaining of the objection was thus proper under Rule 105.

¶ 65 Moreover, the court's ruling invited defendant to produce testimony on the specific point of his historical ability to act "knowingly." By emphasizing that it could not draw the conclusions from the evidence that defendant sought, "without anyone here testifying that the behavior or

conduct or symptoms observed in the reports [also] existed [during the time period] of the offense," the court signaled what it needed and what defendant needed to introduce in order to show that he was unable to act "knowingly" when the incidents occurred. Accordingly, we hold that the trial court did not abuse its discretion in refusing to take judicial notice of the evaluation and the reports for the purpose of demonstrating defendant's historical ability to act "knowingly."

¶ 66    Defendant cites *People v. Jackson*, 2017 IL App (1st) 142879, ¶¶ 26-31, where the court held that, because the defendant exhibited abnormal behaviors, the evidence was insufficient to conclude that the defendant was consciously aware of what he was doing and the results of his actions. In that case, all of the witnesses testified that his behavior, observed at the same time of the incident, was not normal. *Id.* ¶ 26. The court reasoned that the defendant's

> "intent can be inferred from his conduct surrounding the battery and resistance, as well as the actions themselves. [Citation.] When a defendant behaves 'normally,' it is simple to make this inference—we assume that a rational person who kicks a police officer, or resists arrest, knows what he or she is doing. But here, all the State witnesses testified that [the defendant] was not behaving 'normally,' and so we cannot infer from his actions *** that [the defendant] was 'consciously aware' of what he was doing and the results of his actions. Rather, from the State's witnesses' testimony about his actions and conduct, we can infer that [the defendant's] intent was not 'knowing' in the sense that he was not 'consciously aware' of the results of his actions." *Id.* ¶ 29.

The court concluded that the evidence about the defendant's mental state was so conflicting and unsatisfactory that it was insufficient to support his convictions. *Id.* ¶ 31.

¶ 67    We find *Jackson* to be readily distinguishable. In *Jackson*, the witnesses gave testimony about their contemporaneous observations of the defendant, and their testimony showed that the defendant was agitated and behaving irrationally and abnormally. Here, by contrast, the interviews

that resulted in the fitness evaluation and status reports were conducted well after the conduct at issue in this case occurred. The evaluation and the reports indicated that defendant was unable to understand the nature of the proceedings against him or to assist with his defense in those proceedings. The evaluations and reports did not speak at all as to whether, when the incidents occurred, defendant was consciously aware that his contact with G.F. was insulting or provoking. Indeed, there is evidence in G.F.'s testimony that defendant knew his contact would be insulting or provoking, because G.F. testified that defendant gave the excuse that he thought she was cold and he was pulling up her blanket. This sort of excuse, that the touching was accidental, suggests that defendant was well aware that his touching of G.F. was indeed insulting or provoking because it was wrongful, and it would get him in trouble with his parents, whereas accidental touching would not.[5] Further, Smith testified that defendant appeared largely normal and able to understand the questions posed to him. Gallagher, who responded to the scene following Josefina's phone call, believed defendant to be erratic and exhibiting persecutory beliefs. However, these contemporaneous observations are not on par with the defendant's conduct in *Jackson*, and the fitness evaluation and the status reports did not comment on defendant's mental state at the times of the offenses. Thus, because there was little testimony about contemporaneous observation and no testimony about whether, when the incidents occurred, defendant was able to act knowingly, we find *Jackson* to be distinguishable and to offer little guidance under the circumstances of this case.

---

[5]We note that the trial court found that defendant's claim that the touching was accidental as he was pulling up G.F.'s blanket was not credible and determined, instead, that defendant touched G.F.'s breasts as she described in her testimony.

¶ 68    Defendant argues that Oliverio's evaluation noted that defendant had diagnoses of schizophrenia and other mental health issues beginning as early as 2017 and that defendant had difficulty reasoning, which interfered with his decision making. While this is true, defendant overlooks that Oliverio was rendering an opinion on whether defendant was fit to stand trial, meaning whether he understood the proceedings against him and whether he could assist in his defense. Oliverio offered no opinion whatsoever, and he quoted no diagnosis or medical opinion, that suggested that defendant's mental health issues would have prevented him from being consciously aware that his conduct was of an insulting or provoking nature. As noted, some evidence adduced during the discharge hearing suggests the opposite—that defendant, by attempting to excuse his conduct, was in fact aware that it was insulting or provoking and would get him in trouble with his parents. We reject defendant's contention. Accordingly, we hold that the trial court did not abuse its discretion in refusing to take judicial notice of the fitness evaluation and the status reports for the purpose of demonstrating that defendant, when the incidents occurred, could not form the requisite mental state.

¶ 69                    C. Sufficiency of the Evidence

¶ 70    Defendant next argues that the evidence presented at the discharge hearing was insufficient to prove beyond a reasonable doubt that he knowingly made physical contact with G.F. of an insulting or provoking nature. Defendant argues that the evidence showed his contact with G.F.'s breasts was accidental or, alternatively, that his mental illness prevented him from "knowingly" acting. Relatedly, defendant also argues that the State failed to prove that the contact was insulting or provoking, characterizing the contact as accidental because he was putting a blanket on her.

¶ 71    A discharge hearing is not a criminal prosecution but, rather, it is an "innocence only" hearing to determine only whether to enter a judgment of acquittal, not to determine the defendant's guilt. *Waid*, 221 Ill. 2d at 472. An unfit defendant is entitled to have the charges against

him or her dismissed if the evidence is insufficient to prove beyond a reasonable doubt that the defendant committed the charged acts. *Id.* Thus, the standard of proof is the same as required for a guilty verdict—proof beyond a reasonable doubt—even if the determination will not result in a determination of guilt. *People v. Williams*, 312 Ill. App. 3d 232, 234 (2000).

¶ 72    A challenge to the sufficiency of the evidence adduced at a discharge hearing thus proceeds in the same manner as a challenge to the sufficiency of the evidence in a criminal prosecution. The relevant question, after viewing the evidence in the light most favorable to the prosecution, is whether any rational fact finder could have found the essential elements of the offense beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004).

¶ 73    Here, the trial court concluded that the State met its burden of proof regarding defendant's charge of domestic battery based on touching G.F.'s breasts. Defendant argues that the State failed to prove that defendant acted knowingly because the contact was accidental. G.F. testified that, regarding the touching of her breasts, she woke up as defendant was making contact with her breasts. She described that defendant was moving his hands on her breasts over her shirt. G.F. testified that defendant told her he had come into the room to pull up her blanket because he believed she was cold. G.F. denied that she was, in fact, cold.

¶ 74    Defendant argues that the trial court should have accepted his explanation, conveyed through G.F.'s testimony, that he came into her room to cover her with a blanket because he believed she was cold. The court rejected defendant's explanation, noting that G.F. was 12 or 13 at the time of the incident and did not need her nearly 20-year-old brother coming into her room as she slept to see if she happened to be cold. The court also emphasized G.F.'s demeanor as she testified about the incident, namely, visibly upset and crying during her testimony.

¶ 75    To accept defendant's argument would require us to reject the trial court's judgment, as trier of fact, regarding its credibility assessments and weight given to the testimony, and to

substitute our own judgment. That we may not do. *People v. McLaurin*, 2020 IL 124563, ¶ 22. We believe that G.F.'s obvious discomfort and upset when testifying demonstrated the traumatic nature of the encounter with defendant during the incident. We also note that her testimony specified that she awakened to defendant's hands on her breasts and defendant was moving his hands and rubbing her breasts. Defendant's excuse, that he accidentally brushed G.F.'s breast while pulling up the blanket, is both contrary to the conduct to which G.F. testified and evidences a conscious awareness that his touching G.F. was insulting or provoking and required an innocent explanation to excuse it. The evidence adduced at the discharge hearing was sufficient to prove beyond a reasonable doubt that defendant performed the conduct with which he was charged. Accordingly, the trial court properly determined that defendant was not not guilty of the domestic battery charge based on his touching G.F.'s breasts.

¶ 76 Defendant argues that (1) there was no testimony that he touched G.F.'s breasts under her shirt or that he exposed himself to G.F. and (2) he left when she asked him to. According to defendant, this makes it more likely that any contact he made with G.F.'s breasts was accidental. We disagree. The fact that the conduct was not worse than it was does not make defendant's excuse more likely. As noted, G.F.'s description of the contact is fundamentally incompatible with defendant's explanation that he was pulling up a blanket. Moreover, his excuse to G.F. that the contact was accidental further underscores his realization that he should not have been engaging in that contact. We reject defendant's contention.

¶ 77 Defendant also argues that his mental illness means that he could not act "knowingly." We rejected this argument above and need not consider it further.

¶ 78 Finally, defendant argues that the State did not prove that defendant's contact with G.F.'s breasts was objectively insulting or provoking. *People v. Davidson*, 2023 IL 127538, ¶ 16 (whether contact was insulting or provoking is determined on an objective basis). We disagree. Defendant

persists in describing his conduct as accidental contact when he was pulling up a blanket on G.F. While such accidental contact may not be objectively insulting or provoking, defendant's argument ignores the contact G.F. testified about. G.F. testified that she was awakened by defendant moving his hands on her breasts and rubbing them. We are hard pressed to imagine any scenario in which one is awakened from sleep by another person, uninvited, rubbing one's breasts, where such conduct would be anything other than insulting or provoking. Indeed, defendant himself realized the insulting or provoking nature of the contact as demonstrated by his trying to excuse it by telling G.F. he was trying to cover her with a blanket. G.F.'s testimony about the nature and circumstances of the contact along with her testimony about defendant's attempt to avoid consequences by labeling his conduct "accidental" fully demonstrates that the contact was objectively insulting or provoking. We reject defendant's contention.

¶ 79                                   D. Closing the Case File

¶ 80      In his last argument on appeal, defendant contends that the trial court erred in not closing the case file. We disagree.

¶ 81      At oral argument, defendant clarified his concern about not closing the case file and argued that, by not closing the case file, the trial court was preventing the statute of limitations period from resuming—specifically for the aggravated criminal sexual abuse counts the State nol-prossed. We note that, for a victim under 18 years of age, as G.F. was at the times of the offenses, "a prosecution for *** aggravated criminal sexual abuse *** may be commenced at any time." 720 ILCS 5/3-6(j)(1) (West 2020). As to those counts, the resumption of the limitations period is immaterial, as "a prosecution *** may be commenced at any time" under the circumstances of this case. *Id.*

¶ 82      That leaves the domestic battery charge, which is not covered by the extended limitations period, for which a prosecution must be commenced within 18 months after the commission of the

offense. *Id.* § 3-5(b). The parties agree that the limitations period for the charge should resume when the trial court's jurisdiction lapsed on September 1, 2023, which was 30 days following the entry of the final judgment regarding the charge. *People v. Bailey*, 2014 IL 115459, ¶ 8 (ordinarily, a trial court loses jurisdiction after 30 days following a final judgment). We do not definitively decide the issue of when the limitations period should recommence its running, because the issue is not ripe for our consideration at this time, requiring a chain of uncertain occurrences to be completed before the issue ripens: *if* defendant is found fit within the remaining limitations period (18 months, more or less, of September 1, 2023), and *if* the State seeks to revive the misdemeanor prosecution, and *if* defendant invokes the affirmative defense of the limitations period, then the issue will have ripened. The future occurrence of uncertain events is too slender a reed to support our adjudication of the issue at this time.

¶ 83    With that said, defendant straightforwardly contends that section 104-25(g)(3) of the Code (725 ILCS 5/104-25(g)(3) (West 2022)) requires the trial court to close the case file upon the completion of a discharge hearing because it provides that, "[i]f the defendant is not committed pursuant to this Section, he or she shall be released." We disagree.

¶ 84    We first review section 104-25. A discharge hearing is held to determine whether the evidence is sufficient to prove a defendant guilty of the charged conduct. *Id.* § 104-25(a). If the evidence is insufficient to prove the defendant guilty beyond a reasonable doubt, the trial court is required to enter an acquittal, but the defendant may still be committed to the Department of Human Services under the provisions of the Mental Health and Developmental Disabilities Code (405 ILCS 5/1-100 *et seq.* (West 2022)). 725 ILCS 5/104-25(b) (West 2022). If the defendant is not acquitted of the charge during the discharge hearing, he or she may be remanded into an extended course of treatment subject to the time limits provided in section 104-23. *Id.* § 104-25(d). At the end of the period of extended treatment, (1) if the defendant is restored to fitness, the court

may proceed with trial, (2) if the defendant continues to be unfit to stand trial, he or she may be involuntarily civilly committed (with certain procedures and safeguards that are not relevant here), (3) "[i]f the defendant is not committed pursuant to this Section, he or she shall be released," and (4) the maximum extended treatment period shall not exceed the maximum sentence to which the defendant would have been subject had he or she been convicted of the charged offense in a criminal prosecution (subject to certain exceptions not relevant here). *Id.* § 104-25(g).

¶ 85    Defendant focuses on section 104-25(g)(3), claiming the term, "release," is ambiguous and suggesting that it should mean "close the case file." We disagree. As is relevant here, an unfit defendant who is not acquitted in a discharge hearing may be remanded for further treatment. *Id.* § 104-25(d). The further treatment extends for a period of one year up to five years, depending on the severity of the charged offense. *Id.* Thereafter, "[a]t the expiration of an extended period of treatment ordered pursuant to [section 104-25]," if the defendant is not committed under section 104-25(g)(2) (*id.* § 104-25 (g)(2)), "he or she shall be released." We see, then, for subsection (g)(3) to even apply, a discharge hearing must have been held, following which a defendant must have been remanded into the Department's custody for further treatment. *Id.* § 104-25(d). Here, however, because defendant was not committed to a period of extended treatment following the not not guilty finding at the discharge hearing, he does not, by the very terms of the statute, qualify for any consideration under section 104-25(g).

¶ 86    Nevertheless, even if section 104-25(g)(3) applied to defendant, his construction of "released" is untenable because "released" clearly refers to released from the term of extended treatment. In other words, the proper reading of section 104-25(g)(3) is: "At the expiration of an extended period of treatment ordered pursuant to [section 104-25]: *** If the defendant is not committed pursuant to [section 104-25], he or she shall be released." *Id.* § 104-25(g)(3).

"Released" therefore clearly and unambiguously refers to released from the "extended period of treatment."

¶ 87    Because section 104-25(g)(3) does not apply either to defendant's circumstances or to the trial court's decision not to close the case file, his written argument on this point fails to address or support his claim of error that the trial court should have closed the case file. Because, as defendant explained at oral argument, his concern was the resumption of the running of the limitations period, which claim is unripe— because section 104-25(g)(3) is inapplicable to the circumstances of this case, and because "released" in any event refers to any extended treatment period a defendant may be required to undergo—defendant's argument fails.

¶ 88                                   III. CONCLUSION

¶ 89    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 90    Affirmed.

*People v. J.F., 2024 IL App (2d) 230259*

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 21-CF-1940; the Hon. Elizabeth K. Flood, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Elliott A. Borchardt, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Jamie L. Mosser, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |